IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**MARTIAN SALES, INC.**,
30 N Gould St #38603
Sheridan, WY 82801

      Plaintiff,

v.

**UNITED STATES FOOD AND DRUG
ADMINISTRATION**; **ROBERT M.**          Civil Action No. 1:24-cv-3031
**CALIFF**, in his official capacity as the
Commissioner of Food and Drugs; and
**UNITED STATES OF AMERICA,**
White Oak Building 31, Room 4544
10903 New Hampshire Ave
Silver Spring, MD 20993-0002

      Defendants.

---

## COMPLAINT

---

### I.      NATURE OF THE ACTION

1.      This is an action by Plaintiff Martian Sales, Inc. for judicial review of an unwarranted sanction issued by the Food and Drug Administration ("FDA") against Martian Sales in the form of a demonstrably false and punitive publication. The publication falsely characterizes that FDA has unequivocally determined that Martian Sales' kratom product is dangerous to human health. The FDA issued this sanction contrary to its own established rules and the Administrative Procedures Act, 5 U.S.C. § 551, *et seq.* ("APA"), while depriving Martian Sales of its right to due process under the law. Martian Sales therefore here seeks to enjoin this final agency action by the FDA.

2.      Martian Sales brings this action for violations of the APA and pursuant to the Due Process Clause of the Constitution.

## II.     PARTIES

3.      Martian Sales is the trademark owner for one of the highest quality kratom brands in the country.  Martian Sales offers its kratom products for sale as food.

4.      Plaintiff Martian Sales is incorporated under the laws of Wyoming, and has its principal place of business in Wyoming.  Martian Sales is the owner of the O.P.M.S. brand trademark.

5.      Defendant U.S. Food and Drug Administration is a federal agency with regulatory authority over, among other things, food—including dietary supplements and food additives—prescription and non-prescription drugs, medical devices, and cosmetics.  Defendant Califf is sued in his official capacity as Commissioner of the FDA.

6.      Defendant United States of America is named as a defendant pursuant to 5 U.S.C. §§ 702–703 because this is an action for judicial review of actions of an agency of the United States that have affected Martian Sales in a material and adverse manner.

## III.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because it arises under the Constitution and laws of the United States, and 28 U.S.C. § 2201 as Plaintiff seeks declaratory and injunctive relief.  This Court also has jurisdiction under 5 U.S.C. § 702 and § 706 because Martian Sales seeks review of agency action under the APA.

8.      5 U.S.C. § 702 waives United States sovereign immunity for actions seeking declaratory and injunctive relief.

9.      Venue is proper in this District under 28 U.S.C. § 1391(e).

10.     An actual controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as 5 U.S.C. §§ 705 and 706.

### IV.     FACTUAL AND PROCEDURAL ALLEGATIONS

**A.     Kratom has many well-recognized benefits for consumers.**

11.     Kratom refers to the leaves of the *Mitragyna speciosa* ("*M. speciosa*") tree, a tropical evergreen tree in the coffee family, which grows naturally in Asia—specifically, Thailand, Malaysia, and Indonesia.  Humans consume kratom by eating the leaves whole in foods, chewing the leaves, brewing leaves into a tea, grinding the leaves into a power and consuming the power, or creating an extract from the leaves.

12.     Kratom has been used in Asia for centuries.  Historically, many Asian cultures used kratom during socio-religious ceremonies, to treat chronic pain and various medical conditions, and to increase energy, focus, and enhance general well-being.  In recent decades, it has also been reported that consumers are choosing kratom to mitigate symptoms of withdrawal, addiction, and substance use disorders—for example, to treat morphine addiction.[1]

13.     Kratom was introduced to the United States no later than the 1970s; however, kratom's use in the U.S. was not formally studied until the beginning of 2007,[2] and it did not become widespread until approximately 2011.  Consumers' demand for kratom increased exponentially as its beneficial effects became more widely known.[3]

---

[1] *See e.g.*, Ex. 1, Kamarudin Ahmad & Zoriah Aziz, *Mitragyna speciosa use in the northern states of Malaysia: a cross-sectional study*, 141 J. Ethnopharmacology 1, 446–50 (2012).

[2] *See* Ex. 2, Edward W. Boyer et al., *Self-treatment of opioid withdrawal with a dietary supplement*, Kratom, 16 Am. J. Addict. 5, 352–56 (2007).

[3] *See e.g.*, Ex. 3, Oliver Grundmann, *Patterns of Kratom use and health impact in the US—Results from an online survey*, 176 Drug Alcohol Depend. 63 (2017); Ex. 4, Kirsten Elin Smith & Thomas

14.   Kratom is a legal product in the U.S. and is sold by a large variety of retailers around the country.  It is estimated that between 11 and 16 million Americans use kratom regularly.  It is typically sold as a powder, in capsules, or as a liquid tincture or extract.  In addition to its use as a food, thousands of consumers report kratom's benefits for a myriad of health conditions, including chronic pain, some psychiatric conditions such as anxiety and depression, opioid addiction, and alcohol withdrawal.

15.   Humans have used kratom for centuries, but the current study of kratom from a scientific standpoint is a burgeoning field.  More than half of the available scientific literature on kratom was published after 2011, and there are few, if any, controlled clinical trial results that have been published.  Even so, there already are numerous publicly available surveys, case reports, ecological momentary surveys, and other forms of self-reporting which demonstrate that people use kratom products to increase focus and energy, enhance general wellbeing, mitigate pain and anxiety, and improve mood; the growing body of scientific literature also shows that kratom can help those struggling with substance use disorders.[4]

16.   Manufacturers, scientists and government actors alike should be working together to better understand kratom's promising potential.  Many consumers report that kratom provides

---

Lawson, *Prevalence and motivations for kratom use in a sample of substance users enrolled in a residential treatment program*, 180 Drug Alcohol Depend. 340 (2017).

[4] *See e.g.*, Ex. 5, Kirsten E. Smith *et al.*, *Ecological Momentary Assessment of Self-Reported Kratom Use, Effects, and Motivations Among US Adults*, 7 JAMA Network Open 1 (2024); Ex. 6, Oliver Grundmann, *Patterns of Kratom use and health impact in the US—Results from an online survey*, 1 Drug Alcohol Depend. 176, 63–70 (2017); Ex. 7, Marion A. Coe, *Kratom as a substitute for opioids: Results from an online survey*, Drug Alcohol Depend. [Internet] 202:24–32 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31284119; Ex. 8, Rhiannon Bath *et al.*, *Self-reported Health Diagnoses and Demographic Correlates With Kratom Use: Results From an Online Survey*, 14 J. Addict Med. 3, 244-52 [Internet] (2020), https://www.ncbi.nlm.nih.gov/pubmed/31567595.

them a safe, non-drug-alternative to address various conditions, such as fatigue, chronic pain, and substance use disorder.

17.     Kratom is nutrient-rich and contains over 40 alkaloids (at least), which are organic chemical compounds of plant origin that have a pronounced physiological effect on humans.  The most studied kratom alkaloid is mitragynine ("MG").  The *M. speciosa* tree is the only natural source of MG.

18.     Widespread kratom use has been an overlooked and underappreciated part of the bottom-up response to the decades-long polydrug epidemic in the U.S.[5]  Beginning in the early 2000s, when the U.S. response to the opioid crisis began in earnest, researches have shown a corresponding increase in kratom use as an opioid alternative.[6]

19.     As recognized by many distinguished health and research institutions, such as the National Institute on Drug Abuse, kratom has enormous potential to safely and organically treat

---

[5] Ex. 9, Hawre Jalal et al., *Changing dynamics of the drug overdose epidemic in the United States from 1979 through 2016*, 361 Sci. 6408 (2018); Ex. 10, K.E. Smith et al., *Novel methods for the remote investigation of emerging substances: Application to kratom*, 32 Experimental & Clin. Psychopharmacology 2, 215-27 (2023).

[6] Ex. 11, Theodore J. Cicero *et al.*, *Shifting Patterns of Prescription Opioid and Heroin Abuse in the United States*, 373 N. Engl. J. Med. 18, 1789–90 (2015); Ex. 12, Wilson M. Compton et al., *Prescription opioid abuse: Problems and Responses*, 80 Preventive Med. 5 (2015); Ex. 13, Richard C. Dart et al., *Trends in opioid analgesic abuse and mortality in the United States*, 372 N. Eng. J. Med. 3, 241-48 (2015); Ex. 14, Nicole T.M. Hill et al., *Computerized Cognitive Training in Older Adults With Mild Cognitive Impairment or Dementia: A Systematic Review and Meta-Analysis*, 174 Am. J. Psych. 4, 329–40 (2017); Ex. 15, Bokyung Kim et al., *Must-access prescription drug monitoring programs and the opioid overdose epidemic: The unintended consequences*, 75 J. Health Econ. 4 (2021); Ex. 16, David Powell & Rosalie Liccardo Pacula, *The Evolving Consequences of Oxycontin Reformulation on Drug Overdoses*, 7 Am. J. Health Econ. 1, 41–67 (2020); Ex. 17, Emily Rhodes et al., *The effectiveness of prescription drug monitoring programs at reducing opioid-related harms and consequences: a systematic review*, 19 BMC Health Servs. Rsch. 1, 1–11 (2019).

substance use disorders.[7]  Several recent scientific studies link MG to antipsychotic,

antidepressant, and anti-addiction properties because of how this alkaloid binds to dopamine

receptors in the brain.[8]  MG may allow chronic users of opioids to reduce their dependence and

wean themselves off of their opioid addiction with fewer side-effects.

      20.     Kratom is a desirable alternative to pharmaceutical opioids because it is not

significantly addictive.  To the extent that withdrawal symptoms exist, kratom withdrawal is akin

to that of caffeine.

**B.**      **Kratom is sold legally in the United State, and federal agencies are studying its benefits and effects.**

      21.     Kratom is legal in the United States under federal law.

      22.     FDA's limited appreciation or acceptance of current scientific research on kratom,

coupled with kratoms relatively recent surge of use in the U.S. market, has resulted in

contradictory actions and a helter-skelter approach to its regulation by U.S. regulators.

      23.     On August 21, 2014, the Drug Enforcement Administration ("DEA") requested

that the Department of Health and Human Services ("HHS")—the agency under which FDA is

organized—conduct a medical and scientific evaluation of MG as well as another alkaloid found

in kratom, 7-hydroxymitragynine ("7-OH-MG"), to determine whether these substances should

---

[7] *See, e.g.*, Ex. 18, Kirsten Elin Smith et al., *Kratom alkaloids: A blueprint?*, 14 ACS Chem. Neurosci. 2, 195-97 (2023) (NIDA, Kratom Research Topics National Institute on Drug Abuse. 2022).

[8] *See, e.g.*, Ex. 19, E. Boyer et al. (2008). *Self-treatment of Opioid Withdrawal Using Kratom (Mitragynia Speciosa Korth)*, Addiction 103, 1048–50 (2008); Ex. 20, Ammar Imad Hazim et al., *Anxiolytic-like effects of mitragynine in the open-Field and Elevated Plus-Maze Tests in Rats*, 64 *J. Physiol. Sci.* 3, 161–69 (2014); Ex. 21, Victor A.D. Holanda et al. (2019); *Dopamine D1 and D2 Receptors Mediate Neuropeptide S-Induced Antinociception in the Mouse Formalin Test*, 859 *Eur. J. Pharmacol.* 172557 (2019); Ex. 22, Kamini Vijeepallam et al., *Mitragyna Speciosa Leaf Extract Exhibits Antipsychotic-like Effect with the Potential to Alleviate Positive and Negative Symptoms of Psychosis in Mice*, 7 *Front. Pharmacol.* 464 (2016).

be recommended for scheduling as a controlled substance pursuant to the Controlled Substances Act ("CSA").

24.     Pending HHS's evaluation, DEA on August 31, 2016 announced its intent to temporarily add MG and 7-OH-MG to Schedule I of the CSA "to avoid an imminent hazard to the public safety."[9]  "Schedule I drugs" are substances or chemicals with no currently accepted medical use and a high potential for abuse.  Examples of Schedule I drugs include heroin, lysergic acid diethylamide (LSD), 3,4-methylenedioxymethamphetamine (ecstasy), and peyote.

25.     In response, U.S. citizens submitted numerous formal comments expressing that kratom is not harmful, but rather critical to healing, managing pain, and combating opiate and alcohol addiction.[10]  These comments explained that kratom is safer than prescription opioids and that, compared to opioids, deaths attributable to kratom overdose are essentially non-existent.

26.     U.S. Representatives Mark Pocan (D-WI) and Matt Salmon (R-AZ) drafted a letter to DEA and the Office of Management and Budget—a letter that received bipartisan support and was signed by 50 members of Congress—against the ban.  The letter noted that kratom is an internationally recognized herb and condemned the proposed ban as "hasty" because of known beneficial effects of kratom.  The letter said that a ban would adversely affect consumer access to kratom's known benefits and undermine innovative products that could be used to treat individuals suffering from addiction.

---

[9] Ex. 23, DEA, Schedules of controlled substances: temporary placement of mitragynine and 7-hydroxymitragynine into Schedule I, 81 Fed. Reg. 59929 (Aug. 31, 2016) (to be codified 21 C.F.R. pt. 1308), www.gpo.gov/fdsys/pkg/FR-2016-08-31/pdf/2016-20803.pdf.

[10] Ex. 24, *Harven M. Herbal drug kratom faces uncertain legal future, despite public outpouring*, PBS Newshour, www.pbs.org/newshour/updates/whats-next-kratom/ (Dec. 12, 2016, 4:22 PM EDT).

27.     Less than two months later, on October 13, 2016, DEA withdrew its intent to schedule kratom because of "numerous comments from the public."  DEA stated that it was persuaded to take the highly unusual[11] action of reversing itself because of the need to consider "comments offering their opinions regarding the pharmacological effects of these substances."  DEA "requested that the FDA expedite its scientific and medical evaluation and scheduling recommendation for this substance, which DEA previously requested . . . ."  The agency also set a December 1, 2016 deadline for additional comments and in fact received more than 23,000 comments during the 6-week comment period—most of which supported kratom's use.[12]

28.     On October 1, 2017, HHS officials wrote a letter "recommending [to DEA] that the substances mitragynine and 7-OH-MG be permanently controlled in Schedule I of the CSA."[13]  Many individuals—both scientists and members of the public—submitted comments echoing the sentiment of the thousands of citizens who similarly opposed this ban in 2016.  For example, Andrew Kruegel, a Columbia University Professor of Chemistry who has studied kratom, stated:  "I have major concerns about just pulling the rug out from under tens of thousands of people who are using this to support their health, especially in the case of people who are using it to stay off of more dangerous opioids."[14]  Researches also expressed that

---

[11] *See* Ex. 25, Hayden Griffen, Megan E. Webb, *The Scheduling of Kratom and Selective Use of Data*, 50 J. Psychoactive Drugs 2, 114–20 (2018) ("What is most unique about the case of kratom is that the DEA took action and then backed off.").

[12] *Id.*

[13] Ex. 26, Letter from the Office of the Assistant Secretary for Health to The Honorable Robert W. Patterson, Acting Administrator for Drug Enforcement Administration, U.S. Department of Justice (Oct. 17, 2017), https://www.documentcloud.org/documents/5031552-HHS-kratom-letter.html.

[14] Ex. 27, *HHS recommended that the DEA make kratom a Schedule I drug, like LSD or heroin*, PBS Newshour (Nov. 10, 2018, 12:40 PM EDT), https://www.pbs.org/newshour/nation/hhs-recommended-that-the-dea-make-kratom-a-schedule-i-drug-like-lsd-or-

scheduling kratom would make it more difficult to study kratom, because any clinical study would require DEA's permission.

29. FDA was forced to withdraw its 2018 scheduling recommendation to the DEA by Assistant Secretary of Health, Dr. Brett Giroir, who, in doing so, stated that the "decision is based on many factors, in part on new data, and in part on the relative lack of evidence, combined with an unknown and potentially substantial risk to public health if these chemicals were scheduled at this time."[15]  As a result, DEA ceased its scheduling efforts.  Since Dr. Giroir's withdrawal letter, there have been more than 100 new published research reports that further strengthen the case for kratom not being appropriate for scheduling.

30. To date, DEA has not taken further action with respect to kratom.

31. In December 2021, the Expert Committee on Drug Dependence ("ECDD") at the World Health Organization and the U.S. Commission of Narcotic Drugs, comprised of 12 international experts on substance safety and addiction, unanimously concluded that there was insufficient evidence to recommend a critical international scheduling review of kratom.  The ECDD's decision highlights the lack of sufficient evidence to justify the strict scheduling of kratom and suggests that a more measured approach is appropriate.  "People report using kratom to self-medicate a variety of disorders and conditions, including pain, opioid withdrawal, opioid use disorder, anxiety and depression," ECDD said in its report.  "Kratom is being used as a part

---

heroin#:~:text=In%20the%20letter%20letter%20dated,in%20kratom%20on%20Schedule%201.

[15] Ex. 28, *See* Letter from the Office of the Assistant Secretary for Health to The Honorable Uttam Dhillon, Acting Administrator for Drug Enforcement Administration, U.S. Department of Justice (Aug. 16, 2018), https://www.dropbox.com/scl/fi/vgclv41cv0xr6xne6x68z/HHS-Rescission-Letter-Dr.-Giroir-Aug-16-2-018.pdf?rlkey=hynbhtl46j903cewsr0w3m8rg&e=1&dl=0+%28last+accessed+on+August+28%2C+2024%29.

of traditional medicine in some countries.  The Committee considered information regarding the

traditional use and investigation into possible medical applications of kratom," it continued.

"The Committee concluded that there is insufficient evidence to recommend a critical review of

kratom."[16]

32.     FDA's approach toward kratom has been inconsistent.

33.     While the agency has at times claimed that kratom products pose a danger to the

public, recent public filings from a criminal action in the U.S. District Court for the Southern

District of California reveal internal FDA communications to the contrary.  In that case, the

Department of Justice ("DOJ") in response to the defendant's *Brady* request specifically asked

that third-party FDA provide DOJ with documentation supporting its position that kratom is a

"dangerous substance."  The agency refused—according to an email from the Assistant U.S.

Attorney assigned to the case to defense counsel:

> We have been in contact with representatives of the FDA regarding
> the upcoming sentencing hearing regarding the dangers of kratom.
> They have refused to provide us with witnesses or documents to
> support our position, as well as witnesses and documents that might
> be inconsistent with our position.  **The reason they gave was that
> they have not yet made a determination regarding whether
> kratom is dangerous**.  We are prepared to withdraw our sentencing
> memorandum and refile, using supporting materials from
> independent experts and not the FDA . . . .[17]

---

[16] Ex. 29, *See* Patrick Beardsley et al., *WHO Expert Committee on Drug Dependence: forty-fourth report*, World Health Organization [WHO] (2022), https://www.who.int/europe/publications/i/item/9789240042834 (last accessed on October 10, 2024).

[17] Ex. 30, Declaration of Andrew P. Young In Support of [Defendant] Guthery's Motion for Issuance of a Pretrial Subpoena Duces Tecum, *United States v. Nine2Five, LLC*, No. 3:23-cr-00179-TWR (S.D. Ca.) (filed Dec. 6, 2023) Dkts. 110-2, 110-6. (emphasis added)

34.     Notably, despite its refusal to fairly regulate kratom as a food or dietary supplement, FDA has not issued a proposed or final rule specific to the regulation of kratom.  In fact, the agency has only recently begun to conduct formal scientific studies of kratom.

35.     In January 2024, FDA posted a new grant opportunity to fund the first clinical trial "to characterize the abuse potential and subjective effects of botanical Kratom."[18]  FDA will award up to $2,000,000 in grant funding to study kratom.  As of the time of this complaint, FDA has not disclosed publicly a grant recipient.

36.     Recently, on September 19, 2024, FDA issued preliminary results of its first study on kratom products, which showed clearly, as the agency put it, that '[k]ratom leaves appear safe even at high doses when taken in capsule form."[19]  The preliminary results of this study were presented in February 2024 at the University of Florida's Third International Kratom Symposium.  All told, the study—which, though completed for nearly a year has not yet undergone peer review and full publication—noted:  "The data suggest that at the doses tested, using the specific botanical kratom sourced for the study, and under carefully controlled clinical conditions . . . kratom was well tolerated."[20]  Over the course of the study, FDA found no serious complications and stated that it "recognize[s] that further studies are needed to advance our understanding of kratom."  FDA noted plans for additional peer-reviewed research in the near future.

---

[18] Ex. 31, Dep't of Health & Human Servs., *Cooperative Agreement to Support a Human Abuse Potential Study of Botanical Kratom*, https://grants.nih.gov/grants/guide/rfa-files/RFA-FD-24-025.html (last visited Oct. 18, 2024).

[19] *See* Ex. 32, Fiona Rutherford & Immanual John Milton, *Kratom's First FDA Study Suggests Capsules Safe at High Doses*, Bloomberg (Sept. 17, 2024).

[20] Ex. 33, Kelly Teal, *FDA pilot study on kratom leaf concludes botanica 'is well tolerated,'* SupplySide (Sept. 24, 2024), https://www.supplysidesj.com/herbs-botanicals/fda-pilot-study-on-kratom-leaf-concludes-botanical-is-well-tolerated-.

C.    **The FDA issued a surprise, unsubstantiated public warning about Martian Sales'**
**product, O.P.M.S. Liquid Black, intended to punish and harm Martian Sales.**

37.    O.P.M.S. has been an industry-leading kratom brand for more than 5 years.

38.    Martian Sales is the trademark owner of a product called O.P.M.S. Black Liquid

Kratom ("O.P.M.S. Black").  O.P.M.S. Black contains unadulterated kratom; O.P.M.S. Black is

manufactured using the safest and most effective technique to extract the entire, full-spectrum

alkaloid profile found in the kratom leaf.

39.    Each batch of O.P.M.S. Black is rigorously tested to ensure only the highest

quality product reaches the market.

40.    O.P.M.S. Black has an exemplary safety record, having been consumed by

millions of people with no conclusive reports of adverse effects.

41.    Despite Plaintiff's reputation and quality assurance, on July 26, 2024, FDA issued

a surprise public warning (the "July Warning") against O.P.M.S. Black.[21]  The July Warning

"advis[ed] consumers not to consume" O.P.M.S. Black and stated, without citation to evidence

or support, that O.P.M.S. Black "has been underlined to serious adverse health effects, including

death." (emphasis added).  . . .  FDA also represented that it "continually evaluates adverse event

reports of all products containing kratom," and that it "is issuing this safety alert to warn

consumers about serious adverse health effects associated with [O.P.M.S. Black]."[22]  Although

in February 2014, FDA issued an Import Alert allowing U.S. customs officials, at their

---

[21] Ex. 34, FDA, *FDA Warns Consumers Not to Use Optimized Plant Mediated Solutions (OPMS)*
*Black Liquid Kratom* (July 26, 2024), https://www.fda.gov/food/alerts-advisories-safety-
information/fda-warns-consumers-not-use-optimized-plant-mediated-solutions-opms-black-
liquid-kratom.

[22] *Id.* (emphasis added).

discretion, to detain imported kratom products arising from certain manufacturers or distributors,[23] FDA has not announced a final rule or regulation

42.     Without providing any data or evidence that O.P.M.S. Black caused the purported adverse event, the July Warning reveals FDA's intent to single out and punish Martian Sales through a targeted publicity campaign that lacks a foundation in science and data and recklessly and purposefully disseminates damaging accusations against Martain Sales and characterizations of its product that have no basis in the scientific evidence or facts.

43.     FDA is in fact aware that its characterizations of Plaintiff's product are baseless and has refused to address Plaintiff's complaints of FDA's public condemnation and the resultant injury to Martian Sales.

**D.     The July Warning is final agency action.**

44.     The APA authorizes review of "[a]gency action made reviewable by statute and final agency action" for which there is no other adequate remedy in a court.[24]  The APA also specifies that standing for judicial review requires that a party be "adversely affected or aggrieved by agency action."  [25]The APA defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, of the equivalent or denial thereof, or failure to act."[26]

---

[23] Ex. 35, FDA, *US Marshals seize dietary supplements containing kratom* (Jan. 6, 2016), https://www.fda.gov/news-events/press-announcements/us-marshals-seize-dietary-supplements-containing-kratom.  FDA re-issued this alert on July 27, 2023 with substantially the same language.  *See also* FDA Import Alert 54-15.

[24] 5 U.S.C. § 704.

[25] *Id.* § 702.

[26] *Id.* § 551(13).

45.     An agency issuing adverse publicity against a private party intent on penalizing the party that is demonstrably false is final agency action constituting a sanction is ripe for judicial review.

46.     Here, FDA's July Warning was intended to penalize Martian Sales:  it was issued absent investigation and without any basis to conclude that O.P.M.S. Black was the cause of any injury.  It is demonstrably false.  Martian Sales has complied with each of FDA's requests pertaining to this matter, but FDA has not engaged in further discussions, is refusing to provide the data and information on which it relied on to make its determination, and is not willing to discuss the retraction or even modification of the July Warning.

47.     During an inspection of an O.P.M.S. distributor on August 29, 2024, FDA informed the distributor that to FDA's knowledge the alleged death referenced in the July Warning was based on an anonymous call to FDA and FDA actually had no specific information associating O.P.M.S. Black  to the death.

48.     The July Warning and FDA's subsequent actions and inactions reveal FDA's obvious intent to single out and punish Martian Sales through a targeted publicity campaign that is entirely unfounded and recklessly disseminates false accusations against Martain Sales based on characterizations of its product that have no basis in the scientific evidence.

49.     FDA demonstrated, and likely has, no evidentiary basis for issuing the July Warning, and has refused to provide Martian Sales with facts to mollify Martian Sales' justified concerns over the agency's otherwise spurious accusations.  Neither has FDA requested any market action from Martian Sales.

50.     FDA's July Warning is a final action by FDA that is reviewable by this Court. FDA's action (1) marks the consummation of the agency's decision making process regarding

this product and (2) FDA has refused to withdraw the July Warning, which has caused and

continues to cause injury to Martian Sales, including damage to its brand and goodwill and

resulting significant loss of sales.

51.     Within days of the July Warning, Martian Sales contacted FDA about the

Warning and offered to cooperate in any FDA investigation of the product.  Martian Sales asked

for all information about the incident, as well as FDA's factual basis for issuing its statements.

Martian Sales was completely transparent and provided all requested information sought by FDA

with respect to the individuals and businesses responsible for O.P.M.S. Black, and offered

ongoing assistance and a central contact for further inquiries.

52.     Martian Sales promptly sent FDA a Freedom of Information Act ("FOIA")

request, to which FDA has not provided a meaningful response.

53.     Martian Sales also asked FDA to provide all information about the alleged

adverse events, including a purported death, referred to in the July Warning.  FDA has not been

at all forthcoming.  For example, FDA refused to provide the approximate date ranges of when

these events reportedly occurred, or the general location of the consumers involved in the alleged

adverse event.  Disclosing this very generalized information would not violate FDA's

confidentiality obligations.

54.     The FDA's failure to engage in good faith with Martian Sales about the assertions

in the July Warning means that Martian Sales cannot address any of FDA's concerns.  Without

the ability to understand the basis for and substantively address FDA's concerns, the July

Warning must be considered final agency action.

55.     Martain Sale's business and reputation have been and continue to be adversely affected by the unverified and unsubstantiated conclusions publicly announced in the July Warning.

56.     Although it has not clarified, FDA may believe it issued the July Warning under its authority pursuant to 21 U.S.C. § 375(b), which provides that "the Secretary [of Health and Human Services] may . . . cause to be disseminated information regarding food, drugs, devices, tobacco products, or cosmetics in situations involving, in the opinion of the Secretary, imminent danger to health or gross deception of the consumer" (emphasis added).

57.     Yet FDA has not met its duty under the statute to support its statement that O.P.M.S. Black represents such an "imminent danger" to the public health.  Although FDA claims that there are "serious adverse health effects associated with [O.P.M.S. Black]," FDA has no evidence to support its allegation and refuses to further consider its action or engage with Martian Sales about the July Warning.

58.     The FDA's July Warning therefore is final agency action.  Martian Sales has exhausted all efforts to obtain information from FDA.  In August 2, 2024 correspondence, FDA stated that "it would need internal clearance to share certain information," and that it had "started that process."  The FDA has not provided Martian Sales any updates relating to the status of its "internal clearance efforts."  Martian Sales has thus exhausted all efforts to obtain information from FDA.

59.     FDA has not initiated a recall, halted sales, or taken any other action in relation to any kratom products--with the exception of the July Warning.

60.     FDA has sanctioned Martian Sales without basis, and Martian Sales has no legal recourse except in this Court.  The FDA's sanction, the July Warning, therefore constitutes final agency action reviewable by this Court.

## IV.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Arbitrary and Capricious Agency Action [Violations of 5 U.S.C. § 706(2)(A)]**

61.     Plaintiff realleges and incorporates the preceding paragraphs.

62.     The Administrative Procedures Act empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, and an abuse of discretion or not otherwise in accordance with the law."  5 U.S.C. § 706(2)(A).

63.     Agency actions are considered "arbitrary and capricious" if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider important aspects of the problem, offered an explanation for its decision that runs counter to evidence before agency, or is so implausible that it could not be ascribed to difference in view or product of agency expertise.  5 U.S.C.A. § 706(2)(A).  FDA has acted arbitrarily and capriciously by issuing the July Warning without any evidentiary basis in order to single out and punish Martian Sales because of its product O.P.M.S Liquid Black, even though O.P.M.S. Liquid Black has none of the dangerous qualities asserted in the July Warning.

64.     FDA has issued a sanction against Martian Sales for which it has no legal recourse except in this Court.  FDA's sanction, the July Warning, therefore constitutes final action reviewable by this Court.

65.   Martian Sales is entitled to a declaration that FDA's conduct in issuing the July Warning was arbitrary, capricious, an abuse of discretion, unlawful, and was not supported by substantial evidence.

66.   Martian Sales is entitled to a permanent injunction setting aside FDA's action by requiring FDA to remove the July Warning.  Alternatively, Martian Sales is entitled to a mandatory injunction requiring FDA to modify the July Warning to be in accordance with the law.

## SECOND CLAIM FOR RELIEF

### Violation of Constitutional Due Process

67.   Plaintiff realleges and incorporates the preceding paragraphs.

68.   Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule.

69.   FDA's sanction against Martian Sales in the form of targeting its product O.P.M.S Liquid Black is a grave sanction that triggers FDA's duty to provide clear notice of what rule Martian Sales has violated and what it can do to remedy the rule.  The July Warning has damaged O.P.M.S's brand and Martian Sales' goodwill and therefore deprived Martian Sales of significant revenue; this deprivation of Martian Sales' property rights isa fine.  Accordingly, the July Warning is a sufficiently grave sanction such that the duty to provide notice is triggered.

70.   FDA cannot reasonably expect regulated entities to comply with rules of which they have not received notice.  Yet FDA failed to provide notice to Martian Sales before it issued the July Warning, and even now has failed to notify Martian Sales of action it should take to avoid sanction.  Meanwhile, the sanction—the July Warning—remains in place.

18

71.     FDA has issued a sanction against Martian Sales for which it has no legal recourse except in this Court.  FDA's sanction, the July Warning, therefore constitutes final action reviewable by this Court.

72.     Martian Sales is entitled to a declaration that FDA's conduct in issuing the July Warning violates Martian Sales's due process rights.

73.     Martian Sales is entitled to a permanent injunction setting aside FDA's action by requiring FDA to remove the July Warning.  Alternatively, Martian Sales is entitled to a mandatory injunction requiring FDA to modify the July Warning to be in accordance with the law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

1.     Enter a declaratory judgment in favor of Martian Sales and against Defendants, declaring that FDA has acted unlawfully;

2.     Issue an injunction enjoining the FDA's action;

3.     Award such other relief as this Court deems just and proper.

Dated:  October 23, 2024                    Respectfully submitted,


                                            **KILPATRICK TOWNSEND &
                                            STOCKTON LLC**

                                            */s/ Alexander M. Bullock*
                                            **Alexander M. Bullock** (D.C. Bar No. 446168)
                                            701 Pennsylvania Ave, NW, Suite 200
                                            Washington, DC 20004
                                            Telephone: (202) 824-1416
                                            abullock@ktslaw.com

                                            **Gwendolyn C. Payton** (*Pro Hac Vice* pending)
                                            **John Neeleman** (*Pro Hac Vice* pending)
                                            **Jared Allen** (*Pro Hac Vice* pending)
                                            1420 Fifth Avenue, Suite 3700
                                            Seattle, WA 98101
                                            Telephone: (206) 467-9600
                                            gpayton@ktslaw.com
                                            jneeleman@ktslaw.com
                                            jallen@ktslaw.com