**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**MARTIAN SALES, INC.**,

Plaintiff,

v.

**UNITED STATES FOOD AND DRUG ADMINISTRATION**; **ROBERT M. CALIFF**, in his official capacity as the Commissioner of Food and Drugs; and **UNITED STATES OF AMERICA,**

Defendants.

Civil Action No. 1:24-cv-3031

---

**MARTIAN SALES, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 2

- A. Martian Sales's product O.P.M.S ........................................................... 2
- B. Countless consumers and distinguished experts recognize kratom's benefits ......... 3
- C. DEA and FDA reversed their announced intention to schedule kratom as a controlled or illegal substance in response to objections from experts, Congress, and many thousands of public comments ........................................................ 4
- D. Scientific studies since FDA and DEA reversed their decisions to list kratom have only confirmed that kratom is safe, including a recent study FDA ..................... 7
- E. This case arises from FDA's surprise, unsubstantiated public warning about Martian Sales' product, O.P.M.S ......................................................... 8
- F. The July Warning lacks scientific basis and FDA has refused to engage with Martian Sales's in its efforts to discover the underlying report or otherwise address FDA's concerns ......................................................................... 10

III. MARTIAN SALES'S CLAIMS ........................................................................ 12

IV. ARGUMENT ............................................................................................. 12

- A. Applicable motion to dismiss standards .................................................... 12
- B. Martian Sales has standing because it seeks judicial review of alleged final agency action that directly affects its business ................................................. 15
- C. The July Warning is final agency action that is ripe for this Court's review ........ 19
- D. Martian Sales has alleged plausible claims ................................................ 34

V. CONCLUSION .......................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asante v. Azar*,
436 F. Supp. 3d 215 (D.D.C. 2020) ....................31

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ....................14

*Busby v. Capital One, N.A.*,
932 F.Supp.2d 114 (D.D.C. 2013) ....................15

*City of Jersey City v. Consol. Rail Corp.*,
668 F.3d 741 (D.C. Cir. 2012) ....................17

*Company Doe v. Tenenbaum*,
2012 WL 12518563 (D. Md. July 31, 2012), *redacted opinion issued sub nom. Doe v. Tenenbaum*, 900 F. Supp. 2d 572 (D. Md. 2012), *rev'd on other grounds sub nom. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014).................... *passim*

*CropLife Am. v. E.P.A.*,
329 F.3d 876 (D.C. Cir. 2003) ....................21

*CTS Corp. v. EPA*,
759 F.3d 52 (D.C. Cir. 2014) ....................16, 17

*Democracy Forward Found. v. White House Off. of Am. Innovation*,
356 F. Supp. 3d 61 (D.D.C. 2019) ....................26

*Exposures Reported to Poison Centers—United States, 2010-2015*, Morbidity and Mortality Weekly Report ....................26

*Franklin v. Capitol Hilton Hotel*,
325 F. Supp. 3d 25 (D.D.C. 2018) ....................24

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) ....................17

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) ....................14

*Gen. Elec. Co. v. Jackson*,
610 F.3d 110 (D.C. Cir. 2010) ....................35, 36

*Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*,
664 F.3d 940 (D.C. Cir. 2012) ....................17, 18, 25

*Hormel Foods Corp. v. U.S. Dep't of Agric.*,
808 F. Supp. 2d 234 (D.D.C. 2011) .......... 14, 15, 32

*Impro Prods., Inc. v. Block*,
722 F.2d 845 (D.C. Cir. 1983) .......... 20

*Indus. Safety Equip. Assoc., Inc. v. EPA*,
837 F.2d 1115 (D.C. Cir. 1988) .......... 37

*Invention Submission Corp. v. Rogan*,
357 F.3d 452 (4th Cir. 2004) .......... 20

*Janay v. Blinken*,
2024 WL 3432379 (D.D.C. July 16, 2024) .......... 13, 14, 15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 14

*Masters Pharm., Inc. v. Drug Enf't Admin.*,
861 F.3d 206 (D.C. Cir. 2017) .......... 35

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*,
264 F.3d 52 (D.C. Cir. 2001) .......... 19

*Nat'l Ass'n of Home Builders v. E.P.A.*,
786 F.3d 34 (D.C. Cir. 2015) .......... 16

*Nat'l Assn of Home Builders v. E.P.A.*,
786 F.3d at 44–46 (concurring opinion) .......... 18

*Nat'l Min. Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) .......... 21, 29, 30, 33

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .......... 29

*Owlfeather-Gorbey v. Avery*,
119 F.4th 78 (D.C. Cir. 2024) .......... 26

*Real World Media LLC v. Daily Caller, Inc.*,
2024 WL 3835351 (D.D.C. Aug. 14, 2024) .......... 15

*Repetto v. Huerta*,
71 F. Supp. 3d 69 (D.D.C. 2014) .......... 24

*Sierra Club v. E.P.A.*,
292 F.3d 895 (D.C. Cir. 2002) .......... 17

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 16

*Trifax Corp. v. D.C.*,
314 F.3d 641 (D.C. Cir. 2003) ........ 36

*Trudeau v. FTC*,
384 F. Supp. 2d 281 (D.D.C. 2005) ........ 20

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ........ 14, 20, 24

*Unintentional Drug Overdose Deaths with Kratom Detected—27 States, July 2016-December 2017*, Morbidity and Mortality Weekly Report ........ 26

*Williams v. Lew*,
819 F.3d 466 (D.C. Cir. 2016) ........ 26

**Statutes**

5 U.S.C.A. § 553 ........ 35

5 U.S.C.A. § 554 ........ 35

5 U.S.C. § 551(10) ........ 20

5 U.S.C. § 551(13) ........ 12, 17, 18, 20

5 U.S.C. § 702 ........ 34

5 U.S.C. § 704 ........ 31

5 U.S.C. § 706(2)(A) ........ 10, 12

21 U.S.C. § 375(b) ........ 11

**Rules & Regulations**

Fed. R. Civ. P. 8(a) ........ 24

Fed. R. Civ. P. 9(b) ........ 24

Fed. R. Civ. P. 12(b)(1) ........ 12, 13, 14

Fed. R. Civ. P. 12(b)(6) ........ 12, 14, 15, 31

**Other Authorities**

*The 411 on 515: How Oira's Expanded Information Roles in 2002 Will Impact Rulemaking and Agency Publicity Actions*, 54 Admin. L. Rev. 835, 837 (2002)....................23

*Agency Threats*, 60 DUKE L.J. ....................23, 24

Fifth Amendment ....................35

93 CORNELL L. REV. 901, 925 (2008) ....................22

David Zaring*, Best Practices*, 81 N.Y.U. L. REV. 294, 295 (2006) ....................23

EPA "Guidance Memorandum" ....................21

Health & Human Servs., *Cooperative Agreement to Support a Human Abuse Potential Study of Botanical Kratom*, https://grants.nih.gov/grants/guide/rfa-files/RFA-FD-24-025.html (last visited Oct. 18, 2024)....................8

Keith Werhan, *Principles of Administrative Law* § 8.7, 354 (2008) ....................22

Nathan Cortez, *Adverse Publicity by Administrative Agencies in the Internet Era*....................23

Tim Wu, *Agency Threats*, 60 DUKE L.J. 1841, 1841 (2011) ....................22

United States Constitution Due Process Clause....................1

# I. INTRODUCTION

This is an action by Plaintiff Martian Sales, Inc. for judicial review of a sanction issued by the Food and Drug Administration ("FDA"). Martian Sales challenges a publication FDA issued on July 26, 2024 (the "July Warning") related to Martian Sales's product, O.P.M.S. Black Liquid Kratom ("O.P.M.S. Black"). FDA moves to dismiss Martian Sales's Complaint, which alleges that FDA violated the Administrative Procedure Act ("APA") and the Due Process Clause of the United States Constitution. FDA argues that Martian Sales lacks standing, has not alleged final agency action, and has not alleged deprivation of a cognizable property or liberty interest protected by Due Process.

All of FDA's arguments—lack of standing, no final agency action, and no cognizable property or liberty interest—ultimately depend on its assertion that the July Warning does not constitute final agency action. FDA's argument is this Court is powerless to review Martian Sales's claims. But this is wrong. Courts have held that a press release or informal publication constitutes final agency action subject to judicial review if it is intended to punish the plaintiff and the publication demonstrates it qualifies as final agency action. Several courts have found that a press release constituted final agency action reviewable by the court. This is true—as the D.C. Circuit held—even if the publication does not require the plaintiff to do or stop doing anything. The July Warning falsely claims that FDA unequivocally determined that O.P.M.S. Black is dangerous to human health and, based on this broad and unsubstantiated claim, specifically directs consumers to not consume the product. FDA has failed to provide Martian Sales sufficient information about the basis of or source for the sanction, or to communicate with Martian Sales about any corrective action that FDA may require of Martian Sales in order for FDA to remove the Warning or provide additional information to consumers. Where an agency issues and stands

by a publication while refusing to engage the subject of the publication, this constitutes final agency action.

FDA argues that Martian Sales lacks standing because it cannot demonstrate that FDA has caused it to lose revenue. But the law is clear that parties who are objects of final agency action have standing to sue the agency for judicial review regardless of whether the plaintiff lost revenue as a result of the agency action.

FDA argues that the July Warning cannot constitute deprivation of a liberty or property interest because the Due Process clause does not protect reputational injury by the government. This is simply wrong because an agency cannot punish an entity without allowing it the due process required by the APA.

FDA has sanctioned Martian Sales without basis, and Martian Sales has no legal recourse except in this Court. FDA's sanction therefore constitutes final agency action reviewable by this Court. For these reasons, the Court should deny FDA's motion in full.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Martian Sales's product O.P.M.S. Black is an unadulterated kratom product that is legal and has been used by millions of consumers without harm.

Martian Sales is the trademark owner of O.P.M.S. Black. *See* Dkt. 1 ("Compl.") ¶ 38.[1] O.P.M.S. has been a legal kratom product for more than 5 years. *Id.* ¶ 37. O.P.M.S. Black contains unadulterated kratom as it is manufactured to extract the entire, full-spectrum alkaloid profile found in the kratom leaf. *Id.* ¶ 38. O.P.M.S. Black has been consumed by millions of people with no conclusive reports of adverse effects. *Id.* ¶ 40.

---

[1] All numbered exhibits refer to exhibits appended to the Complaint.

**B. Countless consumers and distinguished experts recognize kratom's benefits.**

Kratom refers to the leaves of the *Mitragyna speciosa* ("*M. speciosa*") tree, a tropical evergreen tree in the coffee family, which grows naturally in Asia—specifically, Thailand, Malaysia, and Indonesia. *Id.* ¶ 11. Humans consume kratom by eating the leaves whole in foods, chewing the leaves, brewing leaves into a tea, grinding the leaves into a power and consuming the power, or creating an extract from the leaves. *Id.*

Kratom is legal in the United States under federal law and most state laws, *id*. ¶ 21, and is sold by a large variety of retailers around the country, *id.* ¶ 13. It is estimated that between 11 and 16 million Americans consume kratom regularly. *Id.* It is typically sold as a powder, in capsules, or as a liquid tincture or extract. *Id.*

In addition to its use as a food, thousands of consumers report kratom's benefits for myriad health conditions, including chronic pain, some psychiatric conditions such as anxiety and depression, opioid addiction, and alcohol withdrawal. *Id*. Historically, many Asian cultures used kratom during socio-religious ceremonies, to treat chronic pain and various medical conditions, and to increase energy, focus, and enhance general well-being. In recent decades, it has also been reported that consumers are choosing kratom to mitigate symptoms of withdrawal, addiction, and substance use disorders—for example, to treat opioid addiction.[2]

Widespread kratom use in the U.S. was overlooked until the early 2000s.[3] *Id*. ¶ 18. Beginning in the early 2000s, when the U.S. response to the opioid crisis began in earnest,

[2] *See e.g.*, Ex. 1, Kamarudin Ahmad & Zoriah Aziz, *Mitragyna speciosa use in the northern states of Malaysia: a cross-sectional study*, 141 J. Ethnopharmacology 1, 446–50 (2012).

[3] Ex. 9, Hawre Jalal et al., *Changing dynamics of the drug overdose epidemic in the United States from 1979 through 2016*, 361 Sci. 6408 (2018); Ex. 10, K.E. Smith et al., *Novel methods for the remote investigation of emerging substances: Application to kratom*, 32 Experimental & Clin. Psychopharmacology 2, 215-27 (2023).

researchers have shown a corresponding increase in kratom use as an opioid ameliorant.[4] *Id.*

Many distinguished health and research institutions, such as the National Institute on Drug Abuse, recognize kratom's potential to organically treat substance use disorders with relative safety.[5] *Id.* ¶ 19. Several recent scientific studies link one of the primary alkaloids in kratom, mitragynine, to antipsychotic, antidepressant, and anti-addiction properties because of how this alkaloid binds to dopamine receptors in the brain.[6] *Id.*

**C. DEA and FDA reversed their announced intention to schedule kratom as a controlled or illegal substance in response to objections from experts, Congress, and many thousands of public comments.**

Kraton is legally sold in the United States following intensive investigations and deliberations among federal agencies, including FDA and Congress, about how to classify it.

On August 21, 2014, the Drug Enforcement Administration ("DEA") requested that the Department of Health and Human Services ("HHS")—the agency under which FDA is organized—conduct a medical and scientific evaluation of kratom to determine whether it should

---

[4] Ex. 11, Theodore J. Cicero *et al.*, *Shifting Patterns of Prescription Opioid and Heroin Abuse in the United States*, 373 N. Engl. J. Med. 18, 1789–90 (2015); Ex. 12, Wilson M. Compton et al., *Prescription opioid abuse: Problems and Responses*, 80 Preventive Med. 5 (2015); Ex. 13, Richard C. Dart et al., *Trends in opioid analgesic abuse and mortality in the United States*, 372 N. Eng. J. Med. 3, 241-48 (2015); Ex. 14, Nicole T.M. Hill et al., *Computerized Cognitive Training in Older Adults With Mild Cognitive Impairment or Dementia: A Systematic Review and Meta-Analysis*, 174 Am. J. Psych. 4, 329–40 (2017); Ex. 15, Bokyung Kim et al., *Must-access prescription drug monitoring programs and the opioid overdose epidemic: The unintended consequences*, 75 J. Health Econ. 4 (2021); Ex. 16, David Powell & Rosalie Liccardo Pacula, *The Evolving Consequences of Oxycontin Reformulation on Drug Overdoses*, 7 Am. J. Health Econ. 1, 41–67 (2020); Ex. 17, Emily Rhodes et al., *The effectiveness of prescription drug monitoring programs at reducing opioid-related harms and consequences: a systematic review*, 19 BMC Health Servs. Rsch. 1, 1–11 (2019).

[5] *See, e.g.*, Ex. 18, Kirsten Elin Smith et al., *Kratom alkaloids: A blueprint*, 14 ACS Chem. Neurosci. 2, 195-97 (2023) (NIDA, Kratom Research Topics National Institute on Drug Abuse. 2022).

[6] *See, e.g.*, Ex. 19, E. Boyer et al. (2008). *Self-treatment of Opioid Withdrawal Using Kratom (Mitragynia Speciosa Korth)*, Addiction 103, 1048–50 (2008); Ex. 20, Ammar Imad Hazim et al., *Anxiolytic-like effects of mitragynine in the open-Field and Elevated Plus-Maze Tests in Rats*, 64 *J. Physiol. Sci.* 3, 161–69 (2014); Ex. 21, Victor A.D. Holanda et al. (2019); *Dopamine D1 and D2 Receptors Mediate Neuropeptide S-Induced Antinociception in the Mouse Formalin Test*, 859 *Eur. J. Pharmacol.* 172557 (2019); Ex. 22, Kamini Vijeepallam et al., *Mitragyna Speciosa Leaf Extract Exhibits Antipsychotic-like Effect with the Potential to Alleviate Positive and Negative Symptoms of Psychosis in Mice*, 7 *Front. Pharmacol.* 464 (2016).

be recommended for scheduling as a controlled substance pursuant to the Controlled Substances Act ("CSA"). *Id.* ¶ 23. While HHS's evaluation was ongoing, DEA on August 31, 2016, announced its intent to temporarily add kratom to Schedule I of the CSA "to avoid an imminent hazard to the public safety."[7] *Id.* ¶ 24. In response, U.S. citizens submitted numerous formal comments providing compelling evidence and testimony that kratom is not harmful, but rather critical to healing, managing pain, and combating opiate and alcohol addiction.[8] *Id.* ¶ 25. These comments explained that kratom is safer than prescription opioids and that, compared to opioids, deaths attributable to kratom overdose are essentially non-existent. *Id.*

U.S. Representatives Mark Pocan (D-WI) and Matt Salmon (R-AZ) sent a letter to DEA and the Office of Management and Budget—a letter that received bipartisan support and was signed by 50 members of Congress—against the ban. *Id.* ¶ 26. The letter noted that kratom is an internationally consumed herb and condemned the proposed ban as "hasty" because of known beneficial effects of kratom. *Id.* The letter said that a ban would adversely affect consumer access to kratom's known benefits and undermine innovative products that could be used to treat individuals suffering from addiction. *Id.*

Less than two months later, on October 13, 2016, DEA withdrew its intent to schedule kratom because of "numerous comments from the public." *Id.* ¶ 27. DEA stated that it was persuaded to take the highly unusual action of reversing itself because of the need to consider

[7] Ex. 23, DEA, Schedules of controlled substances: temporary placement of mitragynine and 7-hydroxymitragynine into Schedule I, 81 Fed. Reg. 59929 (Aug. 31, 2016) (to be codified 21 C.F.R. pt. 1308), www.gpo.gov/fdsys/pkg/FR-2016-08-31/pdf/2016-20803.pdf. "Schedule I drugs" are substances or chemicals with no currently accepted medical use and a high potential for abuse. Examples of Schedule I drugs include heroin, lysergic acid diethylamide (LSD), 3,4-methylenedioxymethamphetamine (ecstasy), and peyote.

[8] Ex. 24, *Harven M. Herbal drug kratom faces uncertain legal future, despite public outpouring*, PBS Newshour, www.pbs.org/newshour/updates/whats-next-kratom/ (Dec. 12, 2016, 4:22 PM EDT).

"comments offering their opinions regarding the pharmacological effects of these substances."[9] *Id*. DEA "requested that the FDA expedite its scientific and medical evaluation and scheduling recommendation for this substance, which DEA previously requested . . . ." *Id*. The agency also set a December 1, 2016 deadline for additional comments and in fact received more than 23,000 comments during the 6-week comment period—most of which supported kratom's use.[10] *Id*.

On October 1, 2017, HHS officials wrote a letter to DEA recommending scheduling kratom.[11] *Id*. ¶ 28. Once again, many individuals—both scientists and members of the public—submitted comments echoing the sentiment of the thousands of citizens who similarly opposed the ban when attempted in 2016. *Id*. For example, Andrew Kruegel, a Columbia University Professor of Chemistry who has studied kratom, stated: "I have major concerns about just pulling the rug out from under tens of thousands of people who are using this to support their health, especially in the case of people who are using it to stay off of more dangerous opioids."[12] Researches also expressed that scheduling kratom would make it more difficult to study kratom, because any clinical study would require DEA's permission. *Id*.

FDA withdrew its 2018 scheduling recommendation to the DEA at the direction of Assistant Secretary of Health, Dr. Brett Giroir, who stated that the "decision is based on many factors, in part on new data, and in part on the relative lack of evidence, combined with an unknown

---

[9] *See* Ex. 25, Hayden Griffen, Megan E. Webb, *The Scheduling of Kratom and Selective Use of Data*, 50 J. Psychoactive Drugs 2, 114–20 (2018) ("What is most unique about the case of kratom is that the DEA took action and then backed off.").

[10] *Id.*

[11] Ex. 26, Letter from the Office of the Assistant Secretary for Health to The Honorable Robert W. Patterson, Acting Administrator for Drug Enforcement Administration, U.S. Department of Justice (Oct. 17, 2017), https://www.documentcloud.org/documents/5031552-HHS-kratom-letter.html.

[12] Ex. 27, *HHS recommended that the DEA make kratom a Schedule I drug, like LSD or heroin*, PBS Newshour (Nov. 10, 2018, 12:40 PM EDT), https://www.pbs.org/newshour/nation/hhs-recommended-that-the-dea-make-kratom-a-schedule-i-drug-like-lsd-or-heroin#:~:text=In%20the%20letter%20letter%20dated,in%20kratom%20on%20Schedule%201.

and potentially substantial risk to public health if these chemicals were scheduled at this time."[13] *Id.* ¶ 29. As a result, DEA ceased its scheduling efforts. *Id.*

**D. Scientific studies since FDA and DEA reversed their decisions to list kratom have only confirmed that kratom is safe, including a recent study FDA.**

Since Dr. Giroir's withdrawal letter, there have been more than 100 new published research reports that further strengthen the case for kratom not being appropriate for scheduling. *Id.* DEA has not taken further action with respect to kratom. *Id.* ¶ 30.

In December 2021, the Expert Committee on Drug Dependence ("ECDD") at the World Health Organization and the U.S. Commission of Narcotic Drugs, comprised of 12 international experts on substance safety and addiction, unanimously concluded that there was insufficient evidence to recommend a critical international scheduling review of kratom. *Id.* "People report using kratom to self-medicate a variety of disorders and conditions, including pain, opioid withdrawal, opioid use disorder, anxiety and depression," ECDD said in its report. *Id.* "Kratom is being used as a part of traditional medicine in some countries." *Id.* "The Committee considered information regarding the traditional use and investigation into possible medical applications of kratom" and "concluded that there is insufficient evidence to recommend a critical review of kratom."[14] *Id.*

FDA has not begun to promulgate or issue a proposed or final rule specific to the regulation of kratom and has only recently begun to conduct formal scientific studies of kratom. *Id.* ¶ 34. In

[13] Ex. 28, *See* Letter from the Office of the Assistant Secretary for Health to The Honorable Uttam Dhillon, Acting Administrator for Drug Enforcement Administration, U.S. Department of Justice (Aug. 16, 2018), https://www.dropbox.com/scl/fi/vgclv41cv0xr6xne6x68z/HHS-Rescission-Letter-Dr.-Giroir-Aug-16-2-018.pdf?rlkey=hynbhtl46j903cewsr0w3m8rg&e=1&dl=0+%28last+accessed+on+August+28%2C+2024%29.

[14] Ex. 29, *See* Patrick Beardsley et al., *WHO Expert Committee on Drug Dependence: forty-fourth report*, World Health Organization [WHO] (2022), https://www.who.int/europe/publications/i/item/9789240042834 (last accessed on October 10, 2024).

January 2024, FDA posted a new grant opportunity to fund the first clinical trial "to characterize the abuse potential and subjective effects of botanical Kratom."[15] *Id.* ¶ 35.

Recently, on September 19, 2024, FDA issued preliminary results of its first study on kratom products, which showed clearly, as the agency put it, that "[k]ratom leaves appear safe even at high doses when taken in capsule form."[16] *Id.* ¶ 36. The study further noted: "The data suggest that at the doses tested, using the specific botanical kratom sourced for the study, and under carefully controlled clinical conditions . . . kratom was well tolerated."[17] *Id.* Over the course of the study, FDA found no serious complications and stated that it "recognize[s] that further studies are needed to advance our understanding of kratom." *Id.* FDA noted plans for additional peer-reviewed research in the near future. *Id.*

**E. This case arises from FDA's surprise, unsubstantiated public warning about Martian Sales' product, O.P.M.S. Liquid Black, intended to punish and harm Martian Sales.**

On July 26, 2024, FDA issued the surprise public warning against O.P.M.S. Black.[18] *Id.* ¶ 41. It "advis[ed] consumers not to consume" O.P.M.S. Black and stated, without citation to evidence or other support, that O.P.M.S. Black "has been linked to serious adverse health effects, including death." *Id.*

The July Warning, issued on FDA's website, is titled: "FDA Warns Consumers Not to Use Optimized Plant Mediated Solutions (OPMS) Black Liquid Kratom." *See id.*, Ex. 34. The July

---

[15] Ex. 31, Dep't of Health & Human Servs., *Cooperative Agreement to Support a Human Abuse Potential Study of Botanical Kratom*, https://grants.nih.gov/grants/guide/rfa-files/RFA-FD-24-025.html (last visited Oct. 18, 2024).

[16] *See* Ex. 32, Fiona Rutherford & Immanual John Milton, *Kratom's First FDA Study Suggests Capsules Safe at High Doses*, Bloomberg (Sept. 17, 2024).

[17] Ex. 33, Kelly Teal, *FDA pilot study on kratom leaf concludes botanica 'is well tolerated,'* SupplySide (Sept. 24, 2024), https://www.supplysidesj.com/herbs-botanicals/fda-pilot-study-on-kratom-leaf-concludes-botanical-is-well-tolerated-.

[18] Ex. 34, FDA, *FDA Warns Consumers Not to Use Optimized Plant Mediated Solutions (OPMS) Black Liquid Kratom* (July 26, 2024), https://www.fda.gov/food/alerts-advisories-safety-information/fda-warns-consumers-not-use-optimized-plant-mediated-solutions-opms-black-liquid-kratom.

Warning then has a picture of a bottle of O.P.M.S. *Id.* The July Warning explicitly identifies the product that it is warning consumers not to buy as: "OPMS Black Liquid Kratom sold online and in certain retail stores." *Id.* The July Warning unequivocally states as its "Purpose" that "FDA is advising consumers not to consume OPMS Black Liquid Kratom, which is sold online and in some retail stores." *Id.* The reason for the July Warning was purportedly that "OPMS Black Liquid Kratom has been linked to serious adverse health effects, including death." *Id.* The July Warning provides a "Summary of Problem and Scope" as follows:

> The FDA recently received an adverse event report of a person who died after using OPMS Black Liquid Kratom. This is one of many reports of serious adverse events individuals have reported experiencing after consuming OPMS Black Liquid Kratom. Other reported adverse health effects include withdrawal symptoms, addiction, digestive issues, restless leg syndrome, skin problems, aggressive behavior, increased anxiety, lack of energy, and inability to focus. The product label for OPMS Black Liquid Kratom indicates the presence of kratom alkaloids, mitragynine and 7-hydroxymitragynine (7-OH mitragynine). . . .
>
> The FDA continues to warn consumers not to use kratom because of the risk of serious adverse events, including liver toxicity, seizures, and substance use disorder (SUD).

*Id.* Among its "Recommendation for Consumers," the July Warning unequivocally states: "Consumers should not consume OPMS Black Liquid Kratom." *Id.*

Martian Sales alleges that the July Warning was intended to penalize Martian Sales: it was issued absent investigation and without any basis to conclude that O.P.M.S. Black was the cause of any injury, and it is demonstrably false. *Id* ¶ 46. Martian Sales has complied with all of FDA's requests pertaining to this matter, but FDA has not engaged in further discussions, and refuses to provide the data and information—including the purported autopsy report—on which it relied to make its determination or discuss retracting or even modifying the July Warning. *Id* ¶ 46.

**F. The July Warning lacks scientific basis and FDA has refused to engage with Martian Sales's in its efforts to discover the underlying report or otherwise address FDA's concerns.**

Based on the existing scientific studies investigating kratom, and consumers' experiences, Martian Sales alleges that the July Warning lacks a foundation in science and data, and recklessly and purposefully disseminates damaging accusations against Martain Sales and characterizations of its product that have no basis in the scientific evidence or facts. *Id.* ¶ 42. Martian Sales further alleges that FDA effectively banned O.P.M.S. Black—telling consumers not to use the product—without engaging in the processes required by the APA and contrary to the known science. *Id.* ¶¶ 61–73.

Martian Sales alleges that FDA's actions are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A); it also alleges violations of Constitutional Due Process. *Id.* ¶¶ 6, 1–73.

During an inspection of an O.P.M.S. distributor on August 29, 2024, FDA informed the distributor that to FDA's knowledge the alleged death referenced in the July Warning was based on an anonymous call to FDA and FDA actually had no specific information associating O.P.M.S. Black to the death. *Id.* ¶ 47.

Within days of the July Warning, Martian Sales contacted FDA about the July Warning and offered to cooperate in any FDA investigation of the product. *Id.* ¶ 51. Martian Sales asked for all information about the incident, as well as FDA's factual basis for issuing its statements. *Id.* ¶¶ 51, 53. Martian Sales was completely transparent and provided all requested information sought by FDA with respect to the individuals and businesses responsible for O.P.M.S. Black, and offered ongoing assistance and a central contact for further inquiries. However, FDA refused to provide a copy of the autopsy report. It also declined to provide the approximate date ranges of when these events reportedly occurred, or the general location of the consumers involved in the

alleged adverse event. *Id.* Disclosing this very generalized information would not violate FDA's confidentiality obligations. *Id.*

Martian Sales promptly sent FDA a request pursuant to the Freedom of Information Act ("FOIA"); FDA has not provided a meaningful response. *Id.* ¶ 52.

FDA's failure to engage in good faith with Martian Sales about the assertions in the July Warning means that Martian Sales cannot address any of FDA's concerns. *Id.* ¶ 54. Martain Sale's business and reputation have been and continue to be adversely affected by the unverified and unsubstantiated conclusions publicly announced in the July Warning. *Id.*

The only possible authority for the FDA's issuance of the July Warning is its authority pursuant to 21 U.S.C. § 375(b), which provides that "the Secretary [of Health and Human Services] may . . . cause to be disseminated information regarding food, drugs, devices, tobacco products, or cosmetics in situations involving, in the opinion of the Secretary, *imminent danger* to health or gross deception of the consumer". *Id.* ¶ 56 (emphasis added).

Yet FDA has not met its duty under the statute to support its statement that O.P.M.S. Black represents such an "imminent danger" to the public health. Although FDA claims that there are "serious adverse health effects associated with [O.P.M.S. Black]," FDA has no evidence to support its allegation and refuses to further consider its action or engage with Martian Sales about the July Warning. *Id.*

FDA has not initiated a recall, halted sales, or taken any other action in relation to any kratom products—with the exception of the July Warning. *Id.* ¶ 59.

## III. MARTIAN SALES'S CLAIMS

Martian Sales alleges two causes of action: Arbitrary and Capricious Agency Action, including violations of 5 U.S.C. § 706(2)(A), and Violation of Constitutional Due Process. Complaint ¶¶ 61–73.

The July Warning constitutes final agency action because it is a sanction under 5 U.S.C. § 551(13) that punishes Martian Sales. FDA's July Warning is a final action by FDA that is reviewable by this Court because FDA's action (1) marks the consummation of the agency's decision making process regarding this product and (2) FDA has refused to withdraw the July Warning, which has caused and continues to cause injury to Martian Sales, including significant loss of sales as well as damage to its brand and goodwill.

Martian Sales has exhausted all efforts to obtain information from FDA. In correspondence dated August 2, 2024, FDA stated that "it would need internal clearance to share certain information," and that it had "started that process." FDA has not provided Martian Sales any updates relating to the status of its "internal clearance efforts." Martian Sales has thus exhausted all efforts to obtain information from FDA.

## IV. ARGUMENT

### A. Applicable motion to dismiss standards.

Rule 12(b)(1) applies to FDA's standing challenge, and Rule 12(b)(6) applies to FDA's argument that Martian Sales has failed to plead a cause of action. Rules 12(b)(1) and 12(b)(6) establish somewhat different procedures, but here both require the Court to accept Martian Sales's allegations and all inferences drawn therefrom as true.

"[A] challenge to standing is properly raised on a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(1)" because it disputes the Court's subject matter jurisdiction. *Janay v. Blinken*, 2024 WL 3432379, *2 (D.D.C. July 16, 2024) (citing *Haase v. Sessions*, 835 F.2d 902,

906 (D.C. Cir. 1987)). At the motion to dismiss stage, a plaintiff meets the pleading requirements of Rule 12(b)(1) if it plausibly alleges injury in fact, causality, and redressability. *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "In this posture, the Court must accept the factual allegations of the complaint as true, but must also assess the 'plausibility' of the plaintiff's standing allegations in light of the relevant context and the Court's 'judicial experience and common sense.'" *Id.* (citing *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) & quoting *Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)).

Here, FDA argues that Martian Sales fails to allege standing. FDA also makes a second form of a Rule 12(b)(1) argument that "pose[s] a 'factual' challenge to the Court's jurisdiction." *Id.* FDA challenges Martian Sales' allegation that "[t]he July Warning has damaged O.P.M.S's brand and Martian Sales' goodwill and therefore deprived Martian Sales of significant revenue." *See* Dkt. 12-1 at 16–17. FDA argues that Martian Sales lacks standing because it cannot show injury in fact. It contends that Martian Sales alleges only that it is the owner of the O.P.M.S. brand trademark and a licensor pursuant to an agreement that FDA has obtained from another litigation docket, so Martian Sales cannot suffer lost revenue from anything FDA has done. *Id.*

"When a motion to dismiss is framed in this manner, the Court 'may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'" *Janay*, 2024 WL 3432379 at *2 (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). The Court "has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," so long as it "afford[s] the nonmoving party an ample opportunity to secure and

present evidence relevant to the existence of jurisdiction." *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984)).

Rule 12(b)(6) governs FDA's argument that Martian Sales does not allege a final agency action as required by the APA, and that the Complaint otherwise fails to allege a cause of action. FDA argues that the applicable standard is actually Rule 12(b)(1), and that the Court "must give [Martian Sales's] factual allegations closer scrutiny" "because subject-matter jurisdiction focuses on the court's power to hear the claim." Dkt. 12.1 at 15. In fact, FDA's argument that the July Warning does not constitute final agency action is just a claim that Martian Sales has not pleaded a cause of action and therefore the Rule 12(b)(6) standard applies. "Although the final agency action requirement has been considered jurisdictional because, without it, the court cannot reach the merits of the dispute, the APA grants a cause of action rather than subject matter jurisdiction." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n.4 (D.C. Cir. 2006); *see also Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) ("The APA . . . is not a jurisdiction-conferring statute."); *see also, Hormel Foods Corp. v. U.S. Dep't of Agric.*, 808 F. Supp. 2d 234, 242 (D.D.C. 2011) (same). Consequently, a motion to dismiss claims asserted under the APA on the grounds that there is no final agency action is analyzed under Rule 12(b)(6). *Id.*

Like a 12(b)(1) motion where the challenge is solely to the adequacy of the allegations, "[a] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) 'tests the legal sufficiency of a complaint.'" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see also Lujan*, 504 U.S. at 560–61 (where the defendant argues the complaint fails to any element of standing, the court must accept the allegations of the complaint as true). In evaluating a Rule 12(b)(6) motion, the Court must "liberally construe" the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hormel*, 808 F. Supp. 2d

at 242 (citing *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). The complaint need not include "detailed factual allegations," and a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Janay*, 2024 WL 3432379, at *2 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). The Court may consider only "the facts contained within the four corners of the complaint," along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *Id.*

**B. Martian Sales has standing because it seeks judicial review of alleged final agency action that directly affects its business.**

FDA argues that Martian Sales "has not demonstrated" the first element of standing: "injury in fact." Dkt. 12-1 at 17.[19] "[Standing] consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 3385 (2016), as revised (May 24, 2016) (citations omitted). FDA does not argue that the Martian Sales has failed to plead the second and third elements. Thus, if Martian Sales has alleged that the July Warning has caused Martian Sales injury in fact, the other two elements are

[19] FDA's standing argument relies on a license agreement that FDA found in a filing. The license agreement that FDA filed is no longer operative and has been superseded by a subsequent distribution agreement. Martian Sale's current distribution contract is appended to this opposition as Exhibit A. Article VI Paragraph 5 demonstrates that any subsequent term of renewal—and thus Martian Sales's compensation—is subject to annual negotiation according to, among other factors, sales and market conditions. Thus, FDA's sanction affects future sales for this reason among others. Nevertheless, as explained herein, the law does not require a showing of loss of sales to establish standing where the plaintiff seeks judicial review of a sanction constituting final agency action such as the July Warning.

Martian Sales respectfully requests that the Court take judicial notice of Exhibit A because the Complaint refers to Martian Sales as a licensor of the O.P.M.S. brand and therefore it refers to the distribution agreement appended as Exhibit A. *See Real World Media LLC v. Daily Caller, Inc.*, 2024 WL 3835351, at *3 (D.D.C. Aug. 14, 2024); *Busby v. Capital One, N.A.*, 932 F.Supp.2d 114, 133–34 (D.D.C. 2013). Indeed, it was this reference that FDA cited in seeking judicial notice of the no longer operative agreement that it appended.

met—the injury is traceable to the July Warning and a favorable decision in this case would redress Martian Sales's injury.

Martian Sales alleges that the July Warning "caused reputational 'damage to its brand and goodwill,' which has 'result[ed] [in] significant loss of sales' and 'deprived [it] of significant revenue.'" Compl. ¶¶ 50, 69. FDA challenges both the sufficiency of these allegations and the allegations on their face. FDA asserts that "[a]part from the purported drop in sales revenue, Plaintiff offers 'no allegations' of the Safety Alert's 'present or future consequences'" because "absent are any facts demonstrating how a purported drop in sales injures Plaintiff in its capacity as trademark owner." *Id.* FDA also facially challenges Martian Sales's injury in fact allegation, contending that Martian Sales's "filings in separate litigation suggest that it does not market OPMS Black Liquid and does not share in the sales revenue." *Id.*

Thus, the question is whether Martian Sales must allege loss of revenue in order to survive a motion to dismiss. It is well settled that standing to bring actions for judicial review of final agency action does not require any allegation of lost revenue or showing outside the complaint of lost revenue, because "regulatory constraints typically qualify as injury in fact." *Nat'l Ass'n of Home Builders v. E.P.A.*, 786 F.3d 34, 43 (D.C. Cir. 2015). In *CTS Corp. v. EPA*, 759 F.3d 52 (D.C. Cir. 2014), the D.C. Circuit found standing where the plaintiff had challenged an Environmental Protection Agency (EPA) listing of a property the plaintiff no longer owned on the National Priorities List for environmental cleanup because "simply being linked to a site placed on the List may expose a company to liability or damage a company's business reputation." *Id.* at 57–58 (citing *Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996)). The plaintiff did not claim that the listing caused it any pecuniary loss. *Id.*

"In particular, if the complainant is 'an object of the action (or forgone action) at issue' . . . there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Sierra Club v. E.P.A.*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-62 (1992)); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (same).

For purposes of the standing analysis, the Court "must assume that [Martian Sales] will prevail on the merits of [its] claims," *City of Jersey City v. Consol. Rail Corp*., 668 F.3d 741, 744 (D.C. Cir. 2012)—here, that the July Warning constitutes final agency action because it is a sanction under 5 U.S.C. § 551(13) that punishes Martian Sales. *See infra* § C.3. Here, Martian Sales's product O.P.M.S. Black is the object of the July Warning. That the July Warning does not identify Martian Sales as the owner of the trademark makes no difference. The D.C. Circuit is clear that "for the purpose of determining whether standing is self–evident," there is "no meaningful distinction between a regulation that directly regulates a party and one that directly regulates the disposition of a party's property." *Norton*, 322 F.3d at 734. The FDA principally relies on *Holistic Candlers & Consumers Ass'n v. Food & Drug Admin*., 664 F.3d 940 (D.C. Cir. 2012), which held that "generic" references to the product at issue was "insufficient to transform advisory letters into final agency action." *Id.* at 945. But here FDA specifically named O.P.M.S. Black, so that case is inapposite.

Thus, Article III standing is established by Martian Sales's allegation that the July Warning constitutes a sanction under 5 U.S.C. § 551(13) that punishes Martian Sales; the Court need not examine evidence outside the record to test the sufficiency of Martian Sales's damages allegations. "[A]ny party covered by an agency's regulatory action has standing to challenge" the action, which "proposition is so clearly established it is beyond question." *Nat'l Assn of Home Builders*, 786

F.3d at 44–46 (concurring opinion) (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286–87 (D.C. Cir. 2005) ("[I]t is fairly 'self-evident' that the various appellants as representatives of the regulated parties . . . [have] Article III standing"); *Sierra Club*, 292 F.3d at 899–900 (if a petitioner is an object of the agency action or is directly affected by it . . . there should be little question that it has standing); *Norton*, 322 F.3d at 733–34 (standing can be self-evident when the challenged rule directly regulates the disposition of a petitioner's property); *Sabre, Inc. v. Dep't of Transp*., 429 F.3d 1113, 1119 (D.C. Cir. 2005) (previously unregulated independent computer reservation system operator had standing to challenge an FAA regulation that subjected it to the Department's regulatory authority); *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 93 (D.C. Cir. 2005) (congressmen had standing to launch a conventional administrative law claim, *i.e.*, a facial challenge to allegedly invalid regulations affecting their interests); *Am. Trucking Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (an association created to promote and protect the interests of the trucking industry had representational standing because it had an obvious interest in challenging a rule that directly and negatively impacts its members); *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1401 (D.C. Cir. 1998) (allowing trade association whose members engage in dredging and excavation to mount a facial challenge to the Corps' amendment of a regulation defining "discharge of dredged material")).

**1. Injury to a party's reputation confers standing to sue the government.**

Moreover, even apart from this regulatory context, the law is clear that a party who suffers only reputational injury from government action has standing to sue. Injury to reputation can "suffice for purposes of constitutional standing." *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001) (citing *Meese v. Keene*, 481 U.S. 465, 473–76 (1987) (where the Department of Justice identified foreign films as "political

propaganda," there was standing for a politician who wanted to show the films but claimed that doing so would damage his professional reputation and impair his chances of securing reelection to the California State Senate)).

There is no doubt that the July Warning concretely injures Martian Sales and that the Court can redress this injury if it enjoins the FDA to withdraw the July Warning.

**C. The July Warning is final agency action that is ripe for this Court's review.**

**1. An agency's press release or public statement may constitute final agency action.**

FDA argues that Martian Sales cannot seek judicial review of the July Warning because the Complaint has failed to allege facts sufficient to show FDA engaged in any "agency action," and, even if it did, that FDA did not engage in "final agency action."

FDA first argues that the July Warning is a press release, and that a press release can never be agency action because press releases are not identified in the statutory definition of "agency action." Dkt. 12-1 at 19. This is incorrect. The statutory definition only identifies generic categories of conduct that could constitute agency action, such as a "sanction" or the "equivalent thereof." The APA defines "agency action" to mean a "rule, order, license, sanction, relief, or equivalent or denial thereof, or the failure to act." 5 U.S.C. § 551(13). As Martian Sales alleges, the July Warning as a sanction. *See* Compl. ¶¶ 1, 45, 50, 58, 63, 60, 64, 69–71. The APA's definition of "sanction" include penalties, destruction of property or "taking other compulsory or restrictive action." 5 U.S.C. § 551(10). Courts have held that press releases or other public statements may constitute sanctions—i.e., penalties—subject to judicial review. FDA is wrong that D.C. Circuit precedent "forecloses" the possibility that the July Warning could constitute a sanction.

The D.C. Circuit and this Court have recognized that a press release or public statement can qualify as a "sanction" under Section 551. *See Trudeau v. FTC*, 384 F. Supp. 2d 281, 289 (D.D.C. 2005) ("both the D.C. Circuit and the Fourth Circuit have allowed that agency publicity could, in certain circumstances, come within the definition of final agency action, most likely as an agency 'sanction'") (citing *Indus. Safety Equip. Assoc., Inc. v. EPA*, 837 F.2d 1115, 1119 (D.C. Cir. 1988) ("An agency intent on penalizing a party through adverse publicity, especially false or unauthorized publicity, might well merit a review of its action.")); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 457 (4th Cir. 2004) ("Inasmuch as the APA's definition of 'agency action' includes agency sanctions, adverse publicity might be a 'sanction' and therefore an agency action in certain circumstances."); *Impro Prods., Inc. v. Block*, 722 F.2d 845, 847 (D.C. Cir. 1983) (criticizing interpretation of "final agency action" that "would preclude judicial review under the APA of an agency's dissemination of information that is concededly false and, therefore, completely inconsistent with the statutory purpose of promoting a prosperous agriculture")).

In *Trudeau*, this Court stated that while a press release could "come within the definition of final agency action, most likely as an agency sanction," "[n]o court has ever found a press release to be a final agency action under the APA." 384 F. Supp. 2d at 289. That is not correct. At least three courts, including this Court, have found press releases or the like to constitute final agency action. In *CropLife Am. v. E.P.A.*, 329 F.3d 876 (D.C. Cir. 2003), the D.C. Circuit held that an EPA press release stating that EPA would no longer allow regulated entities to rely on third-party studies to demonstrate the safety of their pesticide products was final agency action. *Id.* at 881 ("The principal issue in this case is whether the EPA directive that is included in the December 14 Press Release constitutes a binding regulation. In defending against the petition for review, most of EPA's arguments are predicated on the assumption that the directive in the Press

Release is not a binding regulation.") The court held that "the directive clearly establishe[d] a substantive rule declaring that third-party human studies are now deemed immaterial in EPA regulatory decisionmaking," *id.* at 883, and further concluded that the "disputed directive concretely injures petitioners, because it unambiguously precludes the agency's consideration of all third-party human studies, *i.e.*, studies that petitioners previously have been permitted to use to verify the safety of their products," *id.* at 884.

In *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011), this Court applied *CropLife* to determine that a public statement issued by an EPA official regarding an EPA "Guidance Memorandum" turned the "Guidance Memorandum" into final agency action even though EPA claimed it was only an interim action subject to change. *See id*. at 43.

Likewise, in *Company Doe v. Tenenbaum*, 2012 WL 12518563, at *1 (D. Md. July 31, 2012), *redacted opinion issued sub nom. Doe v. Tenenbaum*, 900 F. Supp. 2d 572 (D. Md. 2012), *rev'd on other grounds sub nom. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014), the court found that Consumer Product Safety Commission's decision to publish a report implicating the plaintiff's product in the death of an infant was final agency action. The report was only informational and would not have required the plaintiff to take any action or result in any sanction against the plaintiff. *See id.* The plaintiff only complained that the report was false. *Id.* Nevertheless, the Court held that the published report was final agency action because "the Commission evaluated the evidence, judged it against the [enabling statute] and its concomitant regulations, and made a factual and legal 'determination' that the report contained no materially inaccurate information." *See id.* at *27 (citing Keith Werhan, *Principles of Administrative Law* § 8.7, at 354 (2008) (bold emphasis added by the court) ("The **final element** of agency action . . . [i]nvolves . . . the agency's

application of law . . . to fact . . . .")). On the face of the July Warning, this is what the FDA did here.

**2. Agencies including FDA often sanction with adverse publicity, including press releases or other informal publications, as a ploy to avoid judicial review, which courts have not allowed.**

Legal scholars have long noted FDA's use and abuse of purportedly informal press releases as an instrument to coerce behavior from the company that is the object of the adverse publicity. *See, e.g.*, Lars Noah, *The Little Agency That Could (Act with Indifference to Constitutional and Statutory Strictures)*, 93 CORNELL L. REV. 901, 925 (2008) ("Adverse agency publicity is a powerful and often unruly nonlegal sanction" deployed by the FDA.); *see also, id.* at 906–07 (FDA's "arm-twisting" through adverse publicity often "succeeds, and evades judicial or other scrutiny, in part because companies in pervasively regulated industries believe that they cannot afford to resist agency demands. For instance, some critics have accused the FDA of retaliating against firms that fail to cooperate. Whether or not such charges are accurate, the perception leads companies to accede to the agency's wishes even though they may lack any basis in law or fact. Whatever the reason, the FDA has managed to accomplish things that arguably exceed the limits of its delegated authority.") (footnotes omitted); Tim Wu, *Agency Threats*, 60 DUKE L.J. 1841, 1841 (2011) ("There are three main ways in which agencies regulate: rulemaking; adjudication; and informal tools of guidance, also called nonlegislative or interpretative rules. Over the last two decades, agencies have increasingly favored the use of the last of these three, which can include statements of best practices, interpretative guides, private warning letters, and press releases. . . ."); Nathan Cortez, *Adverse Publicity by Administrative Agencies in the Internet Era*, 2011 B.Y.U. L. REV. 1371, 1400–01 (2011). ("As [Professor James T.] O'Reilly observes, 'the forceful assertion of agency condemnation may achieve more in a day than an adjudicative proceeding could produce in many months of effort.' We have long recognized that companies fear adverse

publicity as much as, if not more than, formal sanctions. And in the modern era, when the Internet serves as a content multiplier, and when capital markets seize information without verifying the details, the velocity and severity of the fallout can be even greater.") (quoting James T. O'Reilly, *The 411 on 515: How Oira's Expanded Information Roles in 2002 Will Impact Rulemaking and Agency Publicity Actions*, 54 Admin. L. Rev. 835, 837 (2002))).

As Columbia Professor Steven Wu, also a former Senior Advisor at the Federal Trade Commission, has noted, "The turn to informal methods has been well documented." *Agency Threats*, 60 DUKE L.J. at 1841 n.2 (citing Thomas McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 DUKE L.J. 1385, 1393 (1992) (noting the "increasing tendency of agencies to engage in 'nonrule rulemaking' through relatively less formal devices such as policy statements, interpretative rules, manuals, and other informal devices")); *see also* David Zaring, *Best Practices*, 81 N.Y.U. L. REV. 294, 295 (2006) (providing quantitative evidence of a rise in the use of "best practices" as a means of informal regulation)).

Fortunately, courts including this Court have understood that the FDA's position that a press release or informal public statement can never be final agency action cannot be right because it would mean that the agency could punish regulated entities without following required APA processes and always evade judicial review.

**3. The July Warning is a sanction.**

In *Trudeau*, this Court concluded that, "were a press release ever to qualify as a final agency action, it would be in a case where one and preferably both of two conditions were present. First, there would be evidence that the agency was 'intent on penalizing' a private party through adverse

publicity." *Trudeau*, 384 F. Supp. 2d at 289–90. "Second, there would be evidence that the press release was demonstrably or concededly false." *Id.* at 290.

Martian Sales's allegations regarding the July Warning meet both of these requirements.[20] First, the July Warning on its face seeks to punish Martian Sales, as its very title demonstrates: "FDA Warns Consumers Not to Use Optimized Plant Mediated Solutions (OPMS) Black Liquid Kratom." Compl., Ex. 34. This is a direct effort to stop consumers from purchasing Martian Sales's product. The July Warning unequivocally states as its "Purpose" that "FDA is advising consumers not to consume OPMS Black Liquid Kratom, which is sold online and in some retail stores." *Id.* The July Warning explicitly identifies the product that it is warning consumers not to buy as: "OPMS Black Liquid Kratom sold online and in certain retail stores." *Id.*

Indeed, FDA admits that it issued the July Warning because Martian Sales did not respond to its emails—as a punishment. *See* Dkt. 12-1 at 14 ("As part of that investigation, FDA advised, it had contacted the telephone number and email address listed on the OPMS Black Liquid packaging on May 31, 2024, but it received no response before issuing the Safety Alert on July 26, 2024.") (citing Heller Decl. Ex. A at 1). Legal scholars have long noted the FDA's use and abuse of purportedly informal press releases as an instrument to coerce behavior from the object of the adverse publicity. *See supra* § C.2.

FDA relies primarily on *Holistic Candlers*, 664 F.3d 940. However, the case at bar is actually akin to those distinguished by *Holistic Candlers*, in which agency statements were final because they expressed the agency's "unequivocal position." *Id.* at 945. Here, FDA has stated

[20] Rule 8(a) requires pleadings seeking relief in federal district court to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for relief sought, which may include relief in the alternative or different types of relief." *Repetto v. Huerta*, 71 F. Supp. 3d 69, 71 (D.D.C. 2014) (quoting Fed. R. Civ. P. 8(a)(2)–(3)). Rule 8(a) applies to claims for judicial review of agency action; no enhanced pleading requirements pursuant to Rule 9(b) apply. *Franklin v. Capitol Hilton Hotel*, 325 F. Supp. 3d 25, 28 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

unequivocally that "FDA is advising consumers not to consume OPMS Black Liquid Kratom, which is sold online and in some retail stores." Compl., Ex. 34. FDA disclosed its purported rationale for issuing the July Warning was that "OPMS Black Liquid Kratom has been linked to serious adverse health effects, including death." *Id.* The meaning of these sentences can only be that FDA has concluded its evaluation of O.P.M.S. Black. "By contrast," in *Holistic Candlers*, "FDA expresse[d] no such position, unequivocal or otherwise, regarding its authority to regulate ear candles without taking further administrative action." 664 F.3d at 945.

Second, Martian Sales has alleged sufficient facts that if proven would demonstrate that the July Warning is false. FDA has refused to respond to Martian Sales's FOIA request or otherwise identify the information on which it has based its ongoing sanction against Martian Sale. While it has represented to Martian Sales that the July Warning was issued in response to a report about an anonymous decedent and autopsy report, this vague and undocumented statement is inherently unreliable. *See Company Doe*, 2012 WL 12518563, at *19 ("One cannot reconcile the Commission's attempt to cherry-pick the autopsy report for favorable language with its central conclusion: the cause of death was undetermined."). The Department of Health and Human Services, of which FDA is a part, has itself reported that most if not all deaths of kratom users occurred because of comorbidities, including addiction to controlled substances. For example, a study revealed that "[i]n approximately 80% of kratom-positive and kratom-involved deaths," "the decedents had a history of substance misuse, and approximately 90% had no evidence that they were currently receiving medically supervised treatment for pain. Postmortem toxicology testing detected multiple substances for almost all decedents. Fentanyl and fentanyl analogs were the most frequently identified co-occurring substances; any fentanyl was listed as a cause of death for 65.1% of kratom-positive decedents and 56.0% of kratom-involved decedents. Heroin was the

second most frequent substance listed as a cause of death (32.9% of kratom-positive decedents), followed by benzodiazepines (22.4%), prescription opioids (19.7%), and cocaine (18.4%)." Ex. B,[21] Olsen, et al., *Unintentional Drug Overdose Deaths with Kratom Detected—27 States, July 2016-December 2017*, Morbidity and Mortality Weekly Report, dated April 12, 2019; *see also* Ex. C, Anwar, et al., *Kratom (*Mitragyna speciosa*) Exposures Reported to Poison Centers—United States, 2010-2015*, Morbidity and Mortality Weekly Report, dated July 29, 2016 ("Among calls reporting use of kratom in combination with other substances (multiple exposures), the most commonly reported other substances were ethanol, other botanicals, benzodiazepines, narcotics, and acetaminophen.").

Many distinguished health and research institutions, such as the National Institute on Drug Abuse, recognize kratom's potential to organically treat substance use disorders with relative safety; further, scientific studies link one of the primary alkaloids in kratom, mitragynine, to antipsychotic, antidepressant, and anti-addiction properties because of how this alkaloid binds to dopamine receptors in the brain. Compl. ¶ 19.

Not only has Martian Sales provided examples of strong scientific evidence demonstrating kratom's safety, but O.P.M.S. Black has been consumed by millions of people with no conclusive reports of adverse effects. Compl. ¶ 40. O.P.M.S. has been a legal kratom brand for more than 5 years. *Id.* ¶ 37. O.P.M.S. Black contains unadulterated kratom as it is manufactured to extract the entire, full-spectrum alkaloid profile found in the kratom leaf. *Id.* ¶ 38.

---

[21] Defendant respectfully requests that the Court take judicial notice of Exhibits B and C—appended to this opposition. Judicial notice is appropriate and permissible because these documents government publications. *See e.g.*, *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 85 (D.C. Cir. 2024) ("we can take judicial notice of government reports); *see also Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (taking judicial notice of a government report); *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 70 n.8 (D.D.C. 2019) ("Moreover, the Court can take judicial notice of this Report because it is a government document from a reliable source.").

FDA appears frustrated that kratom is legally sold in the United States following a failed effort by FDA and DEA to classify it as a controlled substance. *See supra* §§ II.C. & II.D. In addition to lacking a basis in science, these efforts failed because U.S. citizens submitted numerous formal comments providing compelling evidence and testimony that kratom is not harmful, but rather critical to healing, managing pain, and combating opiate and alcohol addiction. Compl. ¶ 25. DEA decided not to list kratom as a controlled substance also because fifty members of Congress objected to an effective ban of kratom, an internationally recognized herb, and condemned the proposed ban as "hasty" because of known beneficial effects of kratom. *Id*. The letter said that a ban would adversely affect consumer access to kratom's known benefits and undermine innovative products that could be used to treat individuals suffering from addiction. *Id*.

DEA withdrew its intent to schedule kratom because of "numerous comments from the public"—there were 23,000 of them—offering their opinions regarding the pharmacological effects of these substances." *Id*. DEA "requested that the FDA expedite its scientific and medical evaluation and scheduling recommendation for this substance, which DEA previously requested . . . ." *Id*.

Many individuals—both scientists and members of the public—submitted comments echoing the sentiment of the thousands of citizens who similarly opposed this ban in 2016. *Id*. FDA withdrew its 2018 scheduling recommendation to the DEA at the direction of Assistant Secretary of Health, Dr. Brett Giroir, who stated that the "decision is based on many factors, in part on new data, and in part on the relative lack of evidence, combined with an unknown and potentially substantial risk to public health if these chemicals were scheduled at this time." *Id*. ¶ 30. As a result, DEA ceased its scheduling efforts. *Id*.

FDA possesses no legitimate scientific evidence that undermines the factors that led DEA to decide not to schedule kratom or supports that the purported autopsy report that FDA has refused to produce establishes that O.P.M.S Black caused the death or is otherwise dangerous to human health. Since Dr. Giroir's withdrawal letter, there have been more than 100 new published research reports that further strengthen the case for kratom being safe to consume and not being appropriate for scheduling. *Id.* ¶ 31. DEA has not taken further action with respect to kratom. *Id.* ¶ 31. In December 2021, the relevant World Health Organization subcommittee unanimously concluded that there was insufficient evidence to recommend a critical international scheduling review of kratom. *Id.* ¶ 32.

Moreover, FDA has only recently begun to conduct its own formal scientific studies of kratom, *id.* ¶ 34, the results of which are inconsistent with the July Warning. On September 19, 2024, FDA issued preliminary results of its first study on kratom products, which showed clearly, as the agency put it, that "[k]ratom leaves appear safe even at high doses when taken in capsule form." *Id.* ¶ 36.

Given this regulatory history, FDA has undertaken to stigmatize kratom and its producers through punishing public statements (such as the July Warning that the Complaint plausibly alleges are false) because FDA has been unable to achieve a ban on kratom pursuant to regulatory processes required by law.

Accordingly, given the ever-growing scientific body of evidence that identifies further establishes kratom's safety and many benefits, as well as FDA's suspect regulatory maneuvering, Martian Sales has alleged that the July Warning is a sanction as FDA intended to punish Martian Sales that it is demonstrably false.

**4. The practical effect of FDA's sanction, the July Warning, makes it final agency action.**

"The Supreme Court has explained that, '[a]s a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process,' and second, 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Nat'l Min. Ass'n*, 768 F. Supp. 2d at 41 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Both are true here.

In *Nat'l Min. Ass'n*, this Court rejected EPA's statement that a Guidance Memorandum was only an interim action that was still subject to change. *See id*. at 43. This Court examined both the language of an EPA official's public statement about the Guidance Memorandum (to determine whether it demonstrated "consummation of the agency's decisionmaking process") and the consequences to the regulated entity from that statement (to determine whether through the statement "rights or obligations have been determined, or . . . legal consequences will flow"). *Id.* at 41.

First, this Court held that "[t]he EPA official's statement can only be interpreted as reflecting the EPA's settled, final stance on its current application of the Guidance Memorandum, even if this position may change at some point in the future once the EPA promulgates a new version of the Guidance Memorandum." *Id.* at 45 (citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (noting that "EPA may think that because the Guidance . . . is subject to change, it is not binding and therefore not final action," but concluding that "all laws are subject to change. . . . The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment").

With respect to the consequences of the agency's statement, this Court concluded that "despite the EPA's assertions that the Guidance Memorandum is only an interim document, the Guidance Memorandum is being treated and applied in practice as if it were final." *Id.* "The practical impact imposed upon permit applicants by the recent actions of the EPA are sufficient to satisfy the Bennett finality test because the "finality' element is interpreted in a 'pragmatic way.'" *Id.* (quoting *FTC v. Standard Oil Co. of Cal*., 449 U.S. 232, 239 (1980)).

Here, the language of the July Warning, FDA's actions, and the July Warning's practical effect on Martian Sales, all support Martian Sales's argument that the July Warning is final agency action. The July Warning unequivocally states as its "Purpose" that "FDA is advising consumers not to consume OPMS Black Liquid Kratom, which is sold online and in some retail stores." Compl., Ex. 34. The reason for the July Warning was purportedly that "OPMS Black Liquid Kratom has been linked to serious adverse health effects, including death." *Id.* Among its "Recommendation for Consumers," the July Warning unequivocally states: "Consumers should not consume OPMS Black Liquid Kratom." *Id.*

Moreover, in response to Martian Sales's efforts to engage the FDA and investigate the July Warning's assertions, FDA has stonewalled. FDA's failure to engage in good faith with Martian Sales about the assertions in the July Warning can only mean that FDA is at the end of its decisionmaking process with respect to the July Warning. Drawing inferences in Martian Sales's favor, the Court must presume that FDA refuses to engage Martian Sales's requests because FDA has made up its mind. The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Asante v. Azar*, 436 F. Supp. 3d 215, 222 (D.D.C. 2020). Martian Sales promptly sent FDA a FOIA request, and FDA has refused to provide any documentation. FDA also refused to provide the approximate date ranges of when

the events described in the July Warning reportedly occurred, or the general location of the consumers involved in the alleged adverse event.

Where an agency issued a publication after the plaintiff disputed the publication's claim without engaging further with the plaintiff, this indicates final agency action. In *Company Doe*, the plaintiff challenged the agency's claim and then the agency published its report without further response. *Company Doe*, 2012 WL 12518563, at *27. The court found final agency action because "the Commission evaluated the evidence" in the report that the plaintiff's product had caused the baby's death, "judged it against the [applicable federal statute] and its concomitant regulations, and made a factual and legal 'determination' that the report contained no materially inaccurate information." *Id.* This occurred after the plaintiff obtained an autopsy report and other information allegedly supporting the agency's claim from the plaintiff. *Id.* Here, Martian Sales has attempted to obtain information from FDA, which stood by its publication without providing responsive information to Martian Sales. The Court must draw inferences in favor of Martian Sales and conclude that FDA has published the July Warning and refused to engage Martian Sales because its action is final. With respect to the practical effect of the July Warning, Martian Sales alleges that the July Warning is causing "reputational 'damage to its brand and goodwill,' which has 'result[ed] [in] significant loss of sales' and 'deprived [it] of significant revenue.'" Compl. ¶¶ 50, 69. The Court must accept these allegations as true. In evaluating a Rule 12(b)(6) motion, the Court must "liberally construe" the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hormel*, 808 F. Supp. 2d at 242 (citing *Schuler*, 617 F.2d at 608). FDA's motion itself demonstrates that it has received fair notice of what Martian Sales's claim is and the grounds upon which it rests. Martian Sales's allegations are also entirely plausible. It is plausible that FDA's statements such as "Consumers

should not consume OPMS Black Liquid Kratom" would cause such damage to OPMS Black and its trademark owner, including the loss of significant sales and revenue. Compl. ¶¶ 50, 69.

FDA argues that the July Warning does not satisfy this second prong because FDA did not require Martian Sales to do anything or otherwise impair its right to sell O.P.M.S Black. But in addition to alleging the practical effect of FDA's decision on the market, Martian Sales may satisfy this element by demonstrating that FDA's decision to publish the report "determined [FDA's] own rights and obligations." *Company Doe*, 2012 WL 12518563, at *28. In other words, the passive voice used by the statute means that final agency action occurs where either the agency's own or the plaintiff's rights and obligations are determined by the agency. As the court explained in *Company Doe*:

> The assertion that the report confers no rights or obligations on Plaintiff misstates the second prong of the test for finality. The second prong does not require that the agency action confer rights or obligations on the plaintiff [here, Martian Sales]. Rather, "the action must be one by which rights or obligations have been determined . . . ." *Bennett,* 520 U.S. at 178. The Commission appears to construe this liberal language for the restrictive proposition that the decision must determine Plaintiff's rights or obligations, as opposed to the Commission's, for it to count as final. This self-serving interpretation runs counter to the literal language of *Bennett*. As enunciated in *Bennett*, an equally apposite question is whether the Commission's decision that the report is publishable determined its own rights or obligations. Of course it did. It marked the consummation of the Commission's statutory and regulatory obligation to determine, through informal adjudication, whether to publish the report.

*Id.* The same is true here. The July Warning communicates that FDA made a decision to publish the July Warning after it had completed an investigation and decided that the law required or entitled it to publish the July Warning, which satisfies the second prong.

The July Warning on its face demonstrates that it is the "consummation of the agency's decisionmaking process" with respect to this published report to consumers and that through the July Warning "rights or obligations [whether Martian Sales's or FDA's] have been determined, or . . . legal consequences will flow." *Nat'l Min. Ass'n* , 768 F. Supp. 2d at 41.

**5. Because the July Warning is final agency action, Martian Sales has suffered sufficient hardship to require judicial review.**

FDA admits that any final agency action is ripe for judicial review. *See* Dkt. 12-1 at 19 (citing *Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 8 (D.D.C. 2001)) ("A claim involving an administrative agency action is ripe only when the agency action is final."). Yet FDA suggests that even if the July Warning is final agency action, the Court should still not review it because Martian Sales "has not suffered hardship sufficient to outweigh the interest in deferring judicial review." *Id.* at 25. Specifically, FDA argues that Martian Sales "will not suffer significant 'concrete harm' absent immediate judicial review" because the July Warning "'does not require [it] 'to do anything or to refrain from doing anything.'" *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 134 (2020)). "OPMS Black Liquid remains on the market." *Id.*

But the very point of the case law holding that a press release can constitute final agency action reviewable by a court is to prevent the agency from evading review and circumventing required procedures under the APA. That is what FDA has done here by issuing a punitive press release with demonstratively false statements.

Since Martian Sales has sufficiently alleged that the July Warning was issued as a punishment, that it is demonstratively false, and that FDA's action is final, the resulting hardship on Martian Sales is self-evident. Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Section 702 codifies the longstanding presumption that courts may review agency action." *Company Doe*, 2012 WL 12518563, at *26. "The APA embraces a 'strong presumption in favor of judicial review of administrative action.'" *Id.* (quoting *INS v. St. Cyr*, 533 U.S. 289, 298 (2001)." Further, "[n]umerous Supreme Court cases have established that 'judicial review of a final agency action

by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" *Id.* (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). "[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Id.* (quoting *Bowen*, 476 U.S. at 671–72). FDA has not identified any such Congressional intent. And there is no balance of hardships here that weighs against judicial review.

**D. Martian Sales has alleged plausible claims.**

**1. Count I states a claim under the APA.**

Count I alleges that FDA's sanction was arbitrary and capricious. FDA only argues that Count I fails to state a claim only because the July Warning does not constitute final agency action. Dkt. 12-1 at 26. For the reasons discussed above, FDA is wrong, and the Court should deny FDA's motion to dismiss on the merits.

**2. Count II states a Due Process claim.**

FDA argues that Martian Sales's Due Process claim fails "because (1) Plaintiff's claimed injuries flowing from reputational harm do not constitute a deprivation of a property right; and (2) as discussed above, the Safety Alert is not a final agency action and has no legal consequences, so Plaintiff was not 'due' any process under the Fifth Amendment." Dkt. 12-1 at 27.

FDA's first argument is wrong because it proceeds from a false premise. Martian Sales alleges that the July Warning constitutes a regulatory sanction. Martian Sales does not allege a defamation claim, nor purely reputational harm. FDA cannot issue a sanction to Martian Sales without providing procedural protections required by the APA. *See Masters Pharm., Inc. v. Drug Enf't Admin.,* 861 F.3d 206, 226–27 (D.C. Cir. 2017) ("The Due Process Clause gives regulated parties the right to fair notice of the arguments and evidence against them. An agency may not rely on evidence or arguments that were not discussed at a hearing as a basis for punishing a

regulated party.") (citing *NLRB v. Blake Constr. Co.*, 663 F.2d 272, 279 (D.C. Cir. 1981). *NLRB v. Blake Constr. Co.*, 663 F.2d 272, 279 (D.C. Cir. 1981)). The APA requires agencies to follow specific procedures, including providing notice and an opportunity for a hearing, before issuing sanctions. 5 U.S.C.A. §§ 553, 554. If an agency fails to follow these procedures, it can be found to have violated the due process rights of the regulated entity. *Masters Pharm.,* 861 F.3d 206 at 226–27.

Because Martian Sales has plausibly alleged that FDA issued a sanction, the absence of due process required by the APA before the FDA issued the sanction violates the Constitution. This self-evident reasoning is demonstrated by the very case upon which FDA primarily relies in seeking dismissal of Martian Sales's Due Process claim. In *Gen. Elec. Co. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010), the plaintiff, General Electric, was provided a right to judicial review to the extent that EPA issued any sanction. GE "challenged the constitutionality of a statutory scheme that authorizes the Environmental Protection Agency to issue orders, known as unilateral administrative orders (UAOs), directing companies and others to clean up hazardous waste for which they are responsible." *Id.* at 113–14. GE argued that the statute and EPA's administration of it violated due process because General Electric had to "obtain a pre-deprivation hearing by refusing to comply and forcing EPA to sue in federal court" without having received any administrative hearing before an impartial decisionmaker. *Id.* The D.C. Circuit held that General Electric's right to seek relief in federal court satisfied due process. *Id.* The Court also rejected GE's argument that the right to obtain relief through judicial review was inadequate because "the mere issuance of a UAO can inflict immediate, serious, and irreparable damage by depressing the recipient's stock price, harming its brand value, and increasing its cost of financing." *Id.*

In *General Elec.*, the Court held that the immediate right to judicial review that the statute allowed following agency action despite absence of regulatory proceedings provided General Electic due process. That right to judicial review—which was essential to due process in *General Electric*—is precisely what FDA seeks to deny Martian Sales via its motion. FDA seeks to deprive Martian Sales of any right to seek relief at all.

Even though Martian Sales has suffered reputational injury as a result of the July Warning, Martian Sales's allegation that the reputational injury was caused by a sanction that is final agency action establishes a claimed deprivation of property or liberty that supports a Due Process claim. As the D.C. Circuit has identified the issue with respect to reputational injury: "The key inquiry then is [whether] the government, by attacking personal or corporate reputation, achieved in substance an alteration of status that, if accomplished through formal means, would constitute a deprivation of liberty?" *Trifax Corp. v. D.C.*, 314 F.3d 641, 644 (D.C. Cir. 2003). That is what Martian Sales alleges here: FDA issued a sanction in the form of a press release or other publication that punishes Martian Sales and which Martian Sales alleges is demonstrably false; FDA has refused to provide Martian Sales any due process rights pursuant to the APA; and FDA is now resisting judicial review. FDA's issuance of a punitive press release while refusing to undertake any APA process constitutes a deprivation of Martian Sales's liberty interests.

The other case upon which FDA relies in attacking Martian Sales's Due Process claim is *Indus. Safety*, 837 F.2d at 1115. There, the court dismissed the plaintiff's Due Process claim only because the agency had not issued final agency action: "We hold with the district court that the NIOSH/EPA Guide's respirator recommendations do not constitute agency action that will sustain either an APA or due process claim." *Id.* at 116. While *Indus. Safety* was the first case to hold that "an agency intent on penalizing a party through adverse publicity, especially false or

unauthorized publicity, might well merit a review of its action," it held that on the record facts the plaintiff had not shown that the publication "was intended to penalize" the plaintiff nor offered was there evidence that the publication was false. *Id.* at 1119. In contrast, Martian Sales has alleged that the press release was intended to punish and was false.

## V. CONCLUSION

The Court should deny FDA's motion to dismiss in full.

Dated: January 27, 2025

Respectfully submitted,

**KILPATRICK TOWNSEND & STOCKTON LLP**

*/s/ John Neeleman*
**John Neeleman** (*Pro Hac Vice*)
**Gwendolyn C. Payton** (*Pro Hac Vice*)
**Jared Allen** (*Pro Hac Vice*)
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Telephone: (206) 467-9600
gpayton@ktslaw.com
jneeleman@ktslaw.com
jallen@ktslaw.com

**Alexander M. Bullock** (D.C. Bar No. 446168)
701 Pennsylvania Ave, NW, Suite 200
Washington, DC 20004
Telephone: (202) 824-1416
abullock@ktslaw.com